CHARLES WALKER, JR. ALIAS CHARLES JUNIOR WALKER *v.* STATE OF MARYLAND

[No. 460, September Term, 1970.]

*Decided August 11, 1971.*

The cause was argued before MURPHY, C. J., and MOYLAN and POWERS, JJ.

*Hamilton P. Fox,* with whom were *Hearne, Fox & Bailey* on the brief, for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *William B. Yates, III, State's Attorney for Dorchester County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Charles Walker, Jr., was convicted in the Circuit Court for Worcester County by a jury, presided over by Judge Daniel T. Prettyman, of murder in

the second degree, attempted robbery with a dangerous and deadly weapon, attempted robbery, assault with intent to rob and simple assault. He was sentenced to a term of twenty years imprisonment on the murder count and to terms of five years imprisonment on each of the other four counts, the latter four sentences to be served concurrently with the twenty-year term.

The sole question presented by the appellant on this appeal is whether his confession was properly admitted into evidence against him.

The crimes in this case, all arising out of an attempted robbery of a gas station, occurred on February 11, 1969, in Dorchester County. The appellant was arrested almost one year later on February 2, 1970. He was indicted by the Grand Jury for Dorchester County on February 16, 1970. Through his counsel, he filed on February 18, 1970, a written motion to suppress any statement or confession obtained from him by the police. A full preliminary hearing was held on that motion before Judge C. Burnam Mace on February 24, 1970. Judge Mace ruled that the statement was voluntary.

On February 24, 1970, the appellant had filed a written motion for removal of his case from Dorchester County. Judge Mace ordered the removal on March 6, 1970, to Worcester County. In that county, the case came on for trial before Judge Prettyman and a jury on June 22, 23 and 24, 1970.

When the State reached the point in its case in chief at which the appellant's confession was to be offered, Judge Prettyman made clear his position that, on the question of admissibility, he felt bound by the pretrial ruling made by Judge Mace at the suppression hearing. Judge Prettyman announced:

"Just go ahead and put it in. It has already been ruled on.
The purpose of the preliminary determination, under the motion to suppress, the statement in which you filed, serves exactly the same purpose

as would be served had you waited until the trial of the case, and objected to the entering of a statement, which upon the State would have been obliged to produce the evidence in regard to the voluntariness and admissibility of the statement. In that event, of course, the jury would have been excluded, the determination made and, then, if ruled admissible, the same evidence would be presented for the benefit of the jury, to place them in possession of all of the facts surrounding the taking of the statements so that they could weigh the effect of the statement, give it such weight as they wished to give it. However, because this matter has been determined in a preliminary manner then that removes the necessity for doing it during the trial, and that is the purpose of the preliminary determination, and it is of advantage to the Court that counsel do make these objections known, as preliminary matters, so that can be disposed of without the jury sitting for hours waiting for a determination.

Now, the Court is now bound by the preliminary determination that it is prima facie admissible.

The evidence goes in and then if counsel for the Defense wishes to make an objection again, well, then, it can then make the objection again."

The appellant entered a timely objection both to the admission of the confession and to Judge Prettyman's reluctance to readjudicate the question of admissibility. Judge Prettyman made it clear that all evidence from either party bearing on the issue of voluntariness would be offered before the jury so that the jury could make its ultimate determination upon whether the confession had been shown to be voluntary beyond a reasonable doubt. Judge Prettyman also indicated that if, as the evidence on the issue of voluntariness unfolded, there should develop any material difference between the evi-

dence presented at the trial and that presented at the preliminary hearing, he would feel free to make his own independent decision on the question of admissibility. Both parties then proceeded to present to the jury their cases on the question of voluntariness. The only significant additional testimony presented that had not been presented at the suppression hearing was a series of reports about the appellant made by the Maryland Children's Center in 1969, including a Social Service evaluation, a psychiatric evaluation, a psychological evaluation, a medical summary, a group living examination and a group school report. Judge Prettyman commented that he did not think these reports shifted the balance on the question of voluntariness in any way. He, therefore, felt constrained not to substitute his judgment for that of Judge Mace.

*McChan v. State,* 9 Md. App. 317, holds that it is proper for the trial judge to accept the findings of a pretrial suppression hearing as fully dispositive of any issue of admissibility ruled upon at the suppression hearing. This Court, in dealing with a pretrial ruling on the issue of identification which was accepted by the trial court, held, at 322:

> "The court found that the motion had been ruled on by a court of competent jurisdiction and that it would not entertain the motion because 'the matter has already been ruled on.' We agree that the trial court was not obliged to hear and determine the motion to suppress the identification evidence which had already been fully heard and determined."

See also *Hutchinson v. State,* 9 Md. App. 41, 45, and *State v. Hutchinson,* 260 Md. 227.

While we agree that a trial judge may accept the pretrial finding as *res judicata* and is under no obligation to readjudicate a settled question, we do not agree that he need feel bound by a pre-trial ruling with which he is in strong disagreement. In the case at bar, Judge Pret-

tyman forcefully concluded that a fundamental constitutional right of this appellant had been violated. We agree with that conclusion. We cannot agree that he was powerless to interpose himself under those circumstances.

It follows that we also disagree with the ruling on the admissibility of the confession made at the pre-trial suppression hearing. Because it parallels so closely our own view on the voluntariness *vel non* of the confession as we make our independent constitutional judgment thereon, we feel it meet to repeat the analysis made by Judge Prettyman:

> "Now, let me say this, if I were to rule upon the admissibility of this statement it would never go into evidence. I think that the totality of the circumstances is such that there has been effectively, although perhaps not deliberate, and perhaps not articulated, coercion when a fifteen year old boy, with a dubious eighth grade education, who functions at such a level that he cannot do the simplest arithmetic problems, and remedial training in all basic learning is recommended, and who gives the obvious appearance of being dull, is taken from his home, at 10 o'clock at night, carried to a police station, makes the request to call his mother, and his mother does, in fact, call the police station, after he has made such requests, but he is not informed that she is on the phone, nor is he permitted to talk with her, when the mother is not informed of the nature of the charge, when the mother is not informed that the child is to be questioned, and who informs the police that she will arrive the next morning, and, then, he is taken to Easton, for what I would concede to be perfectly legitimately police investigation and police work, and according to the witness Cox, it was carried out in a routine and perfectly acceptable and laudatory manner, however, he

was then placed alone in the basement of a headquarter's building, in a cell, without light, and there to remain until the following morning, when he is taken to an office, and sits in a chair for at least three hours, without even the offer of breakfast, without the offer of water, in effect, without food nor drink from dinner the night before until lunch the day following, and when he again requested the right to telephone a woman, with whom he had spent all of his formative years, from the age of seven or eight to the age of fourteen or fifteen, and he is again denied that right, and, as Mr. Fox says, in desperation then starts to call for the Sheriff or co-defendant, and is refused, then I suspect, that had he only been refused the right to call Clevon, I wouldn't be at all upset; but even then, I'm not sure but what, in his juvenile mind, Clevon would be such a person as to whom he could place confidence for advice under these trying circumstances. I believe that under all of those facts, that it will be very difficult for an appellate court to find that the confession is admissible. However, I do not honestly believe that under the procedure in Maryland, as of this day, I am at liberty to set aside the previous determination made by the Circuit Court on this issue. There has not been, in my opinion, deduced here any material change in the evidence that would justify this Court in taking the drastic action of setting aside the determination of Judge Mace."

In looking at the propriety of the determination made at the suppression hearing, a word is in order about the scope of our review. The standard was well-articulated by the Supreme Court in *Davis v. North Carolina*, 384 U. S. 737, 741-742:

"It is our duty in this case, however, as in all of

our prior cases dealing with the question whether a confession was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness. E.g., *Haynes v. Washington,* 373 U. S. 503, 515-516, 10 L.Ed.2d 513, 521, 522, 83 S. Ct. 1336 (1963) ; *Blackburn v. Alabama,* 361 U. S. 199, 205, 4 L.Ed.2d 242, 247, 80 S. Ct. 274 (1960) ; *Ashcraft v. Tennessee,* 322 U. S. 143, 147-148, 88 L. Ed. 1192, 1195, 1196, 64 S. Ct. 921 (1944)."

In *Haynes v. Washington,* 373 U. S. 503, the Supreme Court said, at 515-516:

"It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here, see, e.g., *Ashcraft v. Tennessee,* 322 U. S. 143, 147, 148, 88 L. Ed. 1192, 1195, 1196, 64 S. Ct. 921; 'we cannot escape the responsibility of making our own examination of the record,' *Spano v. New York,* 360 U. S. 315, 316, 3 L.Ed.2d 1265, 1267, 79 S. Ct. 1202. While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.' *Stein v. New York,* 346 U. S. 156, 181, 97 L. Ed. 1522, 1540, 73 S. Ct. 1077."

In reviewing the admissibility of a confession, this Court has always recognized its obligation to make an independent review of the record. As we said in *Dennis v. Warden,* 6 Md. App. 295, at 315:

> "While the general rule is that the determination of admissibility of a confession is left largely to the trial court, and will not be disturbed unless there is a manifest abuse of discretion, *Cooper v. State,* 1 Md. App. 190, it is our duty on review to examine the entire record and make an independent determination of the ultimate issue of voluntariness. *Davis v. North Carolina, supra,* at 741-742."

Again, in *Gardner v. State,* 10 Md. App. 233, we said at 245:

> "It is true that in reaching the preliminary decision as to the voluntariness of the statement the court need not find beyond a reasonable doubt that the confession was voluntary; the only duty of the trial court at that point is to decide whether the *prima facie* proof was such as to establish that the confession was freely and voluntarily made. So the preliminary decision of the court as to the admissibility of the confession, made within the required constitutional framework, will not be disturbed on appeal unless there was a clear abuse of discretion. *Barnhart v. State, supra,* at 224-226. But in determining whether the court made its decision within the required constitutional framework we must do so within the rule that '[w]hen constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record.' *Brookhart v. Janis,* 384 U. S. 1, note 4 at p. 4."

In his concurring opinion in *Dillingham v. State,*

9 Md. App. 669, Judge Orth thoroughly analyzed the development of this doctrine of independent judgment from an examination of the whole record where questions of constitutional right are concerned. After discussing the impact of *Jacobellis v. Ohio,* 378 U. S. 184, 187-188; *Bachellar v. Maryland,* 90 S. Ct. 1312, 1313; *Fiske v. Kansas,* 274 U. S. 380, 385; *Pennekamp v. Florida,* 328 U. S. 331, 335; *Stein v. New York,* 346 U. S. 156, 181-182; *Blackburn v. Alabama,* 361 U. S. 199, 205; *Edwards v. South Carolina,* 372 U. S. 229, 235; *Haynes v. Washington,* 373 U. S. 503, 515-516; and *Cox v. Louisiana,* 379 U. S. 536, 545, he concluded, at 714:

> "I think that the effect of the opinions of the Supreme Court is that when a violation of a constitutional right is asserted and properly before us on appeal the clearly erroneous rule as to the lower court's judgment on the evidence, in a non-jury case, and, the rule that the trial court did not err in permitting the case to go to the jury if there was any evidence or rational inferences therefrom on which the jury could find the accused guilty beyond a reasonable doubt, in a jury case, are not appropriate with regard to the constitutional question. Rather we must resolve the matter by our own independent appraisal of the entire record, . . ."

See *Wagonheim v. Maryland State Board of Censors,* 255 Md. 297, 306; *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 330.

Where the resolution of a purely factual question is all that is involved, we, of necessity, give great weight to the finding of the hearing judge, and his decision will not be disturbed on appeal unless we find a clear abuse of discretion. The preliminary decision on the admissibility of a confession, however, be that decision made at a pretrial suppression hearing or while the jury is excused during the course of trial, is "a mixed question of law and fact." *Mulligan v. State,* 10 Md. App. 429, 431,

n. 1; *Barnhart v. State*, 5 Md. App. 222, 224. It is, there-
fore, a situation "where a conclusion of law as to a [con-
stitutional] right and a finding of fact are so inter-
mingled as to make it necessary, in order to pass upon
the [constitutional] question, to analyze the facts." *Fiske
v. Kansas, supra*, 385. We accord "an appropriate and
substantial effect to [the trial court's] resolutions of
conflicts in evidence as to the occurrence or non-occur-
rence of factual events and happenings . . . But . . .
We cannot be precluded . . . from determining whether
the circumstances under which the confession was made
were such that its admission in evidence amounts to a
denial of due process." *Haynes v. Washington, supra*,
515, 516. What we mean, therefore, when we say that
we have the obligation to make an independent, reflec-
tive constitutional judgment on the facts whenever a
claim of a constitutionally-protected right is involved is
that, although we give great weight to the findings of
the hearing judge as to specific, first-level facts (such as
the time that an interrogation began, whether a meal was
or was not served, whether a telephone call was re-
quested, etc.) we must make our own independent judg-
ment as to what to make of those facts; we must, in
making that independent judgment, resolve for ourselves
the ultimate, second-level fact—the existence or non-
existence of voluntariness.

In making our independent, reflective constitutional
judgment on the facts, a further word is in order about
the substantive law to be applied. A substantial body of
law has evolved in this State since *Nicholson v. State*,
38 Md. 140 (1873), and an equally substantial and not
dissimilar body of law has evolved in the Supreme Court
since *Brown v. Mississippi*, 297 U. S. 278 (1936), on the
subject of confessions and their admissibility. Those par-
allel evolutions and the end product of those evolutions
as to what constitutes a "voluntary" confession have been
thoroughly discussed in *Barnhart v. State, supra*, and
*Dennis v. Warden, supra*, 297-300. "The basic standard
governing the admissibility of an extrajudicial statement

is whether, considering the totality of the circumstances, the statement was voluntary . . . To be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' *Keller v. State,* 2 Md. App. 623, 626-627, quoting *Malloy v. Hogan,* 378 U. S. 1, 7." See *Gardner v. State, supra,* 235, n. 1.

Perhaps the best summation of the ultimate issue to be resolved, in terms of traditional voluntariness, was framed by Chief Judge Murphy in *Robinson v. State,* 3 Md. App. 666, at 672, "We think the proper test to be applied in determining the voluntariness of appellant's confession . . . is . . . whether, under all of the circumstances, it was the product of a free and unconstrained will which had not been overborne or compelled."

The seminal case of *Miranda v. Arizona,* 384 U. S. 436, did not supersede pre-existing law on voluntariness. It simply added an additional dimension to that law. As this Court has frequently said, the holdings of *Miranda* were "impressed on that [pre-existing] standard." *Gardner v. State, supra,* 235; *McCoy v. State,* 8 Md. App. 127, 129; *McCarson v. State,* 8 Md. App. 20, 22; *Dennis v. Warden, supra,* 297-299; *Hale v. State,* 5 Md. App. 326, 330-331.

Our decision here that the confession was involuntary does not hinge upon whether *Miranda* was technically complied with or not. Upon our independent, reflective constitutional judgment, we feel that, under the totality of the circumstances, the confession here was involuntary even by pre-*Miranda* standards.

The appellant was arrested without a warrant at approximately 9 P.M. on February 2, 1970. He was taken to the Cambridge Police Station. At the time of arrest, the appellant had just passed his 16th birthday. He had dropped out of school while in the ninth grade. While in the Cambridge Police Station, the appellant was kept in the squad room. It is undisputed that he was there confronted with Cambridge Police Chief Brice H. Kinna-

mon and Dorchester County State's Attorney William B. Yates. At one time or another, he was also in the presence of Sergeant Russell Wroten and State Trooper Donald H. Cox. Chief Kinnamon testified that he and Mr. Yates informed the appellant that he was charged with murder.

The appellant testified that he was questioned about the murder by Mr. Yates and Chief Kinnamon:

> "Q. Who questioned you?
> A. Yates and (indicating).
> Q. Chief?
> A. Yes.
> Q. For how long did they question you there?
> A. Until one o'clock.
> Q. What kind of questions did they ask you?
> A. Him first; Mr. Yates asked me, he said 'Have you ever been downtown for any serious trouble?' and I said "I haven't been down here for stealing or anything like that.', and then he said, 'You're in serious trouble now—', he said '—for murdering—' —I can't think of the man's name. Then he talked to me and asked me if I wanted to make a statement. He then got mad, kind of angry, and said to the Chief 'Why do you want to talk to something like that? Charles Walker, I am charging you with the murder of—' somebody, I can't think of the man's name—; he left, but said he was going to get his secretary or somebody to type it up.
> Q. Then, did he subsequently bring a warrant back to you and read it to you?
> A. No."

> . . .

> "Q. Did the Chief also talk to you at City Police Headquarters?
> A. Yes.
> Q. What did he say to you?

A. He was saying 'You just better get it off your chest; I know you have been thinking about it for a long time. I am sure you want to get it off your chest. Just let it come out and talk to us.' I decided not to say nothing to them."

Chief Kinnamon denied that the appellant was questioned at the Cambridge Police Station. It was undisputed, however, that at no time on the night of February 2 was the appellant ever informed of his *Miranda* rights, including his right to the assistance of counsel. It is also undisputed that no police official took any affirmative step to inform any member of the appellant's family of his predicament. Nor was the appellant ever advised of his privilege to contact anyone.

Chief Kinnamon testified that the appellant was kept at the Cambridge Police Headquarters for about an hour, leaving "a little after eleven o'clock." The appellant testified that he left Cambridge for Easton at 1:10 A.M. on the morning of February 3. Trooper Cox of the State Police testified that he received a call from Sergeant Wroten at approximately midnight, in response to which he came to the Cambridge Police Station. Trooper Cox further testified that it was at 1:30 A.M. that he notified State Troopers Royer and Barnett to proceed to Cambridge and then to transport the appellant to the Easton State Police Barracks, at the request of Chief Kinnamon. The appellant was so transported.

It is also undisputed that while the appellant was being detained in Cambridge, his mother made two attempts by telephone to contact him. She was staying for several days at Hooper's Island, some 32 miles from Cambridge. During the evening of February 2, she heard from her sister, with whom the appellant had been temporarily staying, that he had been arrested. She immediately telephoned the Cambridge Police Station. She talked to Sergeant Wroten. In response to her first call, Sergeant Wroten simply informed her that she should wait a few minutes and then call back. She testified:

"A. I asked him did he have my son, and he told
me to wait a few minutes and call him back.
I called him back, and all he could tell me;
he advised me to get here as soon as possible.
That was it.

Q. What time of night was that?

A. Just about 11:00 o'clock; about 11:30, I don't
know."

Sergeant Wroten's testimony was in accord with that
of the appellant's mother:

"A. Well, I talked with her on two occasions, and

Q. Two occasions?

A. Yes, I did.

Q. That same night?

A. Yes.
I told her we were holding her son, Charles
Walker, on a very serious charge, and that
she should make every attempt that she could
to possibly get to Cambridge to see him or
talk to him. She told me that she was 30
miles away in Hooper's Island, and she said
she couldn't get there. I told her that I would
like for her to come because it is of a very
serious nature; she understood this, and she
said she would try to get there in the morn-
ing.

Q. She gave you no indication that she was go-
ing to try to be there at all?

A. She indicated to me that she wouldn't be able
to make it that evening because she had no
way of coming."

Chief Kinnamon testified that the appellant asked to
call his mother. The sole response to that request was the
communication from Sergeant Wroten that he had al-
ready "talked to his mother and advised her of the con-
dition." Chief Kinnamon testified:

"Q. Who talked to him besides you; you talked to him and the State's Attorney talked to him.

A. We didn't talk to him; we told him what he was charged with, and he asked if he could call his mother. Sergeant Wroten got in touch with his mother and advised that he was at headquarters under a serious charge, and for her to come down.

Q. Did Sergeant Wroten call his mother?

A. I don't know.

Q. Or, did his mother call Sergeant Wroten?

A. I couldn't answer.

Q. He did ask if he could call his mother?

A. Yes.

Q. What answer was made?

A. I think Sergeant Wroten came in and said he had talked to his mother and advised her of the condition.

Q. All right; said that he had talked to his mother about this, but what does this do with regard to his request that he be allowed to talk to his mother; his request was that he be allowed to call his mother, right?

A. Yes, but we couldn't locate her; we tried to get her; then, she called headquarters, I believe, and talked to Sergeant Wroten.

Q. Did you let him talk to his mother?

A. She was advised to come on down and talk to him, yes.

Q. But, within an hour you took him to Easton?

A. Yes, but she never came down at all."

The undisputed end product was that, despite the fact that the squad room where the appellant was held was only one room away from that wherein Sergeant Wroten received the telephone calls, one request from the appellant to communicate with his mother and two telephone calls by the mother to inquire about her son ended up in no direct communication whatsoever between

mother and son. It is undisputed that the mother indicated that a heavy fog prevented her from getting from Hooper's Island to Cambridge that night but that she would come to the Cambridge Police Station on the following morning. Notwithstanding the expected arrival of the mother, the appellant was moved from Cambridge to Easton at sometime after 1 A.M. Chief Kinnamon explained the transfer:

> "Q. After you talked to his mother, or after the other officer talked to his mother, then, you took him to Easton?
> A. State police carried him to Easton.
> Q. Why was he taken to Easton?
> A. Fingerprints and photographs.
> Q. You are able to fingerprint and photograph at Cambridge, are you not?
> A. We were tied up and I requested that they do this.
> Q. When was he brought back from Easton?
> A. Well, I was over at Easton the next day, and I believe it was some time in the afternoon."

The mother was not informed of the change in place of detention. She arrived at the Cambridge Police Station on the morning of February 3 and was then informed that her son had been transferred to Easton. It is undisputed that the appellant was fingerprinted and otherwise processed immediately upon his arrival at the Easton Barracks at between 1:30 and 2:00 A.M. If the only purpose for his transfer were this, no explanation was offered of why he was not then returned to Cambridge, of why he spent the night in a cell in Easton, and particularly of why upon the following morning he was not returned to Cambridge for interrogation instead of being kept in Easton for that purpose.

A pattern emerges of diligent perseverance and initiative in solving the crime sharply juxtaposed with an almost studied helplessness and incomprehension that the appellant wanted or needed communication with family

or legal counsel. It is difficult to discount the notion that the failure to put the appellant on the telephone to his mother, coupled with the transfer of the appellant to Easton ostensibly to save a few minutes of fingerprinting and photography, was a deliberate effort to keep the appellant incommunicado until after he had confessed.

It is also undisputed that during the hours when the appellant was being detained at the Cambridge Police Station, a magistrate was present for part of that time. The magistrate was called there by Chief Kinnamon for the purpose of signing arrest warrants for the appellant, whose actual arrest antedated the obtaining of the warrant by several hours, and for several of the appellant's ultimate co-defendants. The appellant was never brought face-to-face with the magistrate. There was, to be sure, no *Mallory*-type [1] obligation to bring the appellant before the magistrate. Notwithstanding lack of legal obligation, an earnest solicitude for the protection of this juvenile appellant might well have argued for some communication to him of his rights from a "neutral" force rather than solely from the "adversary" forces in the investigative and prosecutive process. Such earnest solicitude was nowhere apparent.

It was undisputed that the appellant, after being processed at the Easton Barracks, was placed for the remainder of the night in a small cell on the basement floor. Although at one point he testified as to being left in total darkness, it developed that one lightbulb had been left burning.

The formal interrogation session commenced with the arrival of Trooper Thomas Duncan at 9 A.M. on February 3. The statement was completed at 11:50 A.M., some fourteen to fifteen hours after arrest. Then and only then did the appellant receive two buns to eat. He received his first meal at 4 P.M. that afternoon. It was undisputed that the appellant had neither food nor water from the time of his arrest shortly after 9 P.M. on

---

1. *Mallory v. United States*, 354 U. S. 449.

February 2 until approximately noon on February 3.
When asked particularly why no breakfast had been
served the appellant, the State replied simply that the
appellant never asked for any.

Again on the morning of February 3, the appellant
tried to make telephonic contact with the outside world.
Again the effort was to no avail. After the interrogation
session had begun on the morning of February 3, the
appellant, before giving any statement, requested per-
mission to call his aunt, Clara Tilghman. The appellant
had been raised by Mrs. Tilghman from the time he was
seven years of age until he was fourteen years of age.
Trooper Duncan testified with respect to that request:

"Q. You say at one stage of the game prior to his
    making the statement, you say he wanted
    Clevon Tilghman's mother?
A. Yes, sir.
Q. Now, is Clevon Tilghman's mother also his
    aunt?
A. I don't know, sir.
Q. Do you know that he had, at one time, lived
    with this Mrs. Tilghman?
A. No, sir.
Q. And, that she is his aunt?
A. I didn't realize this, no, sir.
Q. Well, what was done about his request that
    he be able to call Clevon Tilghman's mother?
A. Sergeant Wroten gave him an explanation;
    exactly what was said I cannot say; how-
    ever, Mr. Walker apparently accepted the ex-
    planation because he made no further re-
    quest to make a call.
Q. Was his request that he be allowed to call
    Clevon Tilghman's mother granted?
A. It was not."

After being refused permission to call his aunt, the
appellant requested permission to call his cousin, Clevon

Tilghman. Trooper Duncan testified with respect to that request:

"A. He also requested one other call.
Q. All right; what was that, sir?
A. He requested to call Clevon Tilghman, and at this time, I advised him personally that Clevon Tilghman was incarcerated and charged with homicide in reference to the same case, and that he was incarcerated in the Dorchester County jail and he was unable to call at this time.
Q. Did he appear to understand this?
A. Yes, sir; he didn't repeat his demand for a call.
Q. He didn't repeat his demand for a call?
A. No, sir."

Sgt. Wroten was also present when the appellant requested permission to call his aunt. He testified about that request as well as about an additional request of the appellant to call the Dorchester County Sheriff's Office:

"A. Well, Charles asked me, or he had been told that Clevon was arrested, and Charles indicated to me that he wanted to call Clevon Tilghman's mother to find out whether they had been arrested or not. That is what Charles Walker Junior, or Charles Junior Walker indicated to me, so his request was denied. He also requested to call the Dorchester County Sheriff's Office to see if they had been arrested. This was prior to the statement being made, and the request was denied."

The end result was that the appellant was permitted no contact with the outside world whatsoever until after his confession had been reduced to writing and signed.

During the course of the interrogation, a series of photographs depicting the murder scene was shown to

the appellant. Included among these were photographs showing bloodstains all over the wall of the gas station, and one of the murder victim showing in gory detail that the top of his head had been blown off and that part of his brains were spilling out over the floor. While the ostensible explanation for showing these photographs to appellant was to orient him with respect to the crime scene, they likely had a highly-charged emotional effect upon him. He testified with respect to the photographs:

"Q. During the time that you were over there did they show you any photographs?
A. Yes, sir.
Q. Who showed the photographs?
A. Wroten.
Q. Where were you when he showed the photographs?
A. I was in the office.
Q. What was said to you when the photographs were shown to you?
A. He said they were going to show me some pictures of a crime that happened.
Q. I show you these photographs that have been marked for identification, and ask you if these are some of the photographs that were shown to you on that night—morning, excuse me?
A. Yes, sir.
Q. Were they all shown to you?
A. Every last one of them.
Q. Was this before or after you made the statement that they were shown to you?
A. Before."

The appellant also testified about a mixed threat and promise delivered to him by Sgt. Wroten at the Easton Barracks:

"Q. Now, what was said to you in order to get you to make a statement?

A. He said—
Q. Say who said what.
A. Wroten, and that man there; the one with the tie, I don't know what his name is, said 'We can give you so much time you wouldn't be able to—'
Q. Give you so much time, and what?
A. 'Give you so much time you won't be able to —'
Q. Anybody say anything about it going easier on you if you made a statement?
A. Yes, sir.
Q. What was said about that?
A. Wroten.
Q. What did he say?
A. Said that it would go easier on me since I am the youngest, and only sixteen.
Q. Where was that said to you?
A. Over at the Easton Barracks.
Q. And, that was said to you by—
A. Wroten."

Sgt. Wroten, however, denied ever having engaged in such a conversation. In resolving a pure factual dispute, Judge Mace believed Sgt. Wroten and disbelieved the appellant. We accept that finding of fact.

Although we do not reverse on the basis of *Miranda*, the circumstances surrounding the timing and the substance of advice and warnings given to an accused are relevant as part of the totality used to determine even pre-*Miranda* voluntariness. It is clear that the appellant here received no *Miranda* warnings until the morning of February 3. Once the formal interrogation session began, however, at shortly after 9 a.m., Trooper Duncan was meticulous in following *Miranda's* ritual. After having been informed of his *Miranda* protections, the appellant requested permission to telephone his aunt, his cousin and the sheriff, and those requests were denied. There was then a hiatus in the proceedings until Chief Kinna-

mon could arrive at the Easton Barracks. The break lasted from approximately 10 A.M. until approximately 11 A.M. Upon the arrival of Chief Kinnamon, Trooper Duncan went through the *Miranda* warnings orally one additional time in the presence of the Chief. The confession was then taken from the appellant.

The mere preamble in the now-challenged confession, reciting that it was voluntarily given, is entitled to little weight. As the Supreme Court said in *Haynes v. Washington, supra,* at 512-513:

> "Even were it otherwise, there would be substantial doubt as to the probative effect to be accorded recitations in the challenged confession that it was not involuntarily induced. Cf. *Haley v. Ohio,* 332 U. S. 596, 601, 92 L. Ed. 224, 229, 68 S. Ct. 302 (opinion of Mr. Justice Douglas). It would be anomalous, indeed, if such a statement, contained within the very document asserted to have been obtained by use of impermissible coercive pressures, was itself enough to create an evidentiary conflict precluding this Court's effective review of the constitutional issue. Common sense dictates the conclusion that if the authorities were successful in compelling the totally incriminating confession of guilt, the very issue for determination, they would have little, if any, trouble securing the self-contained concession of voluntariness."

The making of an independent, reflective constitutional judgment upon a totality of circumstances is an *ad hoc* process that inevitably varies from one set of facts to the next. Precise quantitative analysis of each factor in the total equation is not possible. Some discussion of the relative influence of the various factors is, however, desirable.

The fact that the appellant's mother did not get to see him until the following Saturday, five days after his arrest, and the fact that she was never informed by the

authorities of his return from Easton to Cambridge but had to learn of that from friends and relatives are not decisive since they relate to occurrences after the fact of confession. They do lend interpretative color, however, to the attitude of the authorities vis-a-vis the protections due a 16-year-old boy.

The age of the appellant alone is not dispositive of this case. *State v. Hance,* 2 Md. App. 162, teaches that youthful age alone will not operate automatically to negate the voluntariness of a confession. Age is, nevertheless, a highly-relevant factor to be considered. *Hargis v. Warden,* 3 Md. App. 76, 80, n. 3, citing *Haley v. Ohio,* 332 U. S. 596. That the appellant was a school dropout of limited intelligence is also at least a minor factor in the total picture. Considered too are the facts that the potentially horror-producing photographs were shown to this youth and that he was kept without food or water for some fourteen to fifteen hours. These are significant both in terms of the subjective effect upon the appellant himself and as indicators of the mood of the law enforcement officials and of the atmosphere inevitably generated by such mood.

The major factor, however, though intertwined inexorably with the others, is the fact that this juvenile, regardless of how heinous were the offenses with which he was charged, was held incommunicado until after his confession was obtained. The corrosive effect upon the will of incommunicado detention in a "police-dominated atmosphere" was analyzed in *Haynes v. Washington, supra,* at 514-515:

> "We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects. Of course, detection and solution of crime is, at best, a difficult and arduous task requiring determination

and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused."

In *Gaudio and Bucci v. State,* 1 Md. App. 455, this Court, quoting *Miranda,* spoke of the inherent coercion "in the incommunicado police-dominated atmosphere," at 467-468:

" 'An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in the courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.' "

See also *Myers v. State,* 3 Md. App. 534, 537.

In *Ledbetter v. Warden,* 368 F. 2d 490, Judge Soboloff analyzed the effect of incommunicado detention upon one being interrogated. Ledbetter was 19 years of age and had received an eighth-grade education. He was arrested at between 3 and 5 o'clock in the afternoon and signed a confession shortly after 8:30 that evening. Before giving the confession, Ledbetter had requested the opportunity to telephone his family and that request had been refused. Judge Soboloff said, at 492:

"This youth was alone in the hands of the police, and his requests to contact his family were refused. . . .

When Ledbetter was refused permission to make a phone call he knew full well that the police intended to hold him incommunicado and pursue their interrogations until they would bear fruit. The crucial inquiry is the suspect's knowledge that he will continue to be kept incommunicado. The coercive influence cannot be measured by the number of hours Ledbetter was actually detained, but only by the effect upon him of the obvious intention of the police to persist in their secret inquisition without granting his request to communicate with the outer world."

In *Haley v. Ohio, supra,* the Supreme Court was dealing with the admissibility of a confession by a 15-year-old boy. It pointed out the extra need that one of tender years possesses for the reassuring presence of counsel or family. The Court said, at 599-600:

"Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. . . .

He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at the side of this 15-year old boy as the police, working in relays, questioned him hour after hour, from

midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning."

In *Haley*, there was evidence that the defendant had been fully advised of his constitutional rights. Of the significance of that advice, the Court said, at 601:

"But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain."

The *Haley* case is also instructive as to the significance of some occurrences even after the fact of confession. The Court said, at 600:

"A photographer was admitted at once; but his closest friend—his mother—was not allowed to see him for over five days after his arrest. It is said that these events are not germane to the present problem because they happened after the confession was made. But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with

a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. When the police are so unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year old boy behind closed doors in the dead of night becomes darkly suspicious."

Upon all of the circumstances in this case, viewed in their totality, it is our independent, reflective constitutional judgment that the appellant's confession was not voluntary and should, therefore, not have been admitted into evidence against him. Accordingly, we must reverse.

*Judgments reversed; case remanded for a new trial.*