GARY LEE SABATINI a/k/a Gary Lee Marino *v.*
STATE OF MARYLAND

[No. 319, September Term, 1971.]

*Decided February 10, 1972.*

The cause was argued before ORTH, MOYLAN and POWERS, JJ.

*Charles Joseph Sullivan, Jr.,* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur*

*A. Marshall, Jr., State's Attorney for Prince George's County,* and *E. Allen Shepherd, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

GARY LEE SABATINI, also known as Gary Lee Marino, was found guilty by a jury in the Circuit Court for Prince George's County of robbing William Bryant Dowling [1] with a deadly weapon. A sentence of 10 years was imposed.

*THE FACTS ADDUCED AT THE TRIAL*

Dowling, the manager of a liquor store in Beltsville, Prince George's County, Maryland, was working in the store on 14 December 1970 with another employee, William J. Chilcoate. About 9:15 p.m. a man, later identified as a Mr. Andrews, came in the store and "shopped around." He had on a black raincoat or trench coat and an off-white or ivory colored hat turned up all around. He wore no tie and his collar was open. The legs of his pants were turned up "a couple cuffs." He selected a bottle of Seagram's Crown Royal. The bottle, enclosed in a blue velvet bag, was in a box. Its price was $9.25. With the box under his arm, he examined other merchandise in the store until about 9:30 p.m. when he paid for the Seagram's with a $10 bill. Given his change he pulled out a small, silver colored handgun, told the two employees to go to the back and ordered them to get the money out of the cash box. The cash box contained only change. Saying he did not want that, the robber ordered Dowling "to get the money" and Dowling handed him about $700 in bills and checks from the safe. The robber made Dowling and Chilcoate lie on the floor and left. From 3 to 5 minutes elapsed from the time the robber pulled the gun

---

1. So designated in the indictment. In the transcript of the proceedings the victim is designated as "William Brian Dowling."

to his departure. Dowling phoned the police and two squad cars arrived "in a couple of minutes." An officer suggested, "Well, one of you come with me and we will go for a ride and see if maybe we can see him if he's on foot." Chilcoate went. As the car left the parking lot a message was received on the radio that a suspect had been pulled over and shortly thereafter another call that an officer had been shot in front of the Hess Station about a half mile from the store. The squad car went to the scene and Chilcoate saw the man who had committed the robbery lying on the side of the road. Nearby was a blue Chevrolet.

Corporal Herbert E. Bolvin of the Prince George's County Police received a radio report of the robbery about 9:41 p.m. He directed two of his officers to go to the crime scene and he drove to a shopping center at Powder Mill Road and Route 1. He was there about 30 seconds when a blue Chevrolet containing two men passed by. Its rear license tag was covered by tissue paper. Bolvin activated his cruiser's red light and siren, followed the Chevrolet and pulled it over. Bolvin was reporting to his dispatcher when Sabatini, the driver of the car, got out, and walked toward the police car. Bolvin told Sabatini to stay by the rear of the Chevrolet. When the officer completed his report he got out of the police car. He saw the passenger in the Chevrolet, seated in the right front seat, lean forward, his arms moving "in a way that he was stuffing something under the front seat or taking something from the front seat, one of the two." The passenger had on a black coat. Bolvin told Sabatini "to tell his passenger to get out of the car with his hands in clear view * * *." Sabatini and the other man talked about 30-45 seconds but Bolvin could not hear what was said. The passenger got out of the car. Sabatini asked why he had been stopped and Bolvin told him because of the paper obliterating the rear license tag. Sabatini pulled off the paper and stuffed it in his pocket saying, "Oh, it must have fell out of the trunk." Bolvin recounted what then happened:

"His passenger asked me * * * if he wanted me to have him go to the front of the vehicle and obtain the registration card. I told him no. He had started to turn around towards the front of the car and I said, 'No, stay where you are and keep your hands out of your pockets in clear view.' Then he turned back towards me and he started walking back towards my cruiser, and he made a statement that it was a rather cold evening that night. I said it sure was. I said, 'Just get your hands out of your pocket and back up towards the rear end of your car and stay there.' * * * I had called for assistance several times, but my radio was rather bad. When I turned my emergency equipment on, my radio cuts out on me sometimes, and I couldn't hear what the dispatcher was saying, and I was trying to get through to my dispatcher to get a better lookout so I could made positive identification on the passenger in the car. About this time Sergeant Nicholls pulled back in behind me on the traffic stop that I had. As he got out of his car—his car was parked directly behind mine. When he got out of his car, he walked between the two cruisers and then up the right side of my cruiser. At this time I got back into my cruiser and asked my dispatcher again for a definite lookout. When he came back and told me what the lookout was again, I told him I had a good suspect. As I said the word 'suspect' the man that was with Mr. Sabatini turned around, pulled a gun out of his pocket and shot Sergeant Nicholls. I exited my vehicle, leaned across the hood and fired back. * * * I fired three across the hood and then he started to fall. I ran back between the cruisers and came back up the right side. Sergeant Nicholls was just getting back up on his knees. I fired one more shot to make certain that the man was either down

or if he was going to fire back, I could have fire cover. As I ran towards the front of the car Mr. Sabatini was at the rear left of his vehicle. I fired one more shot, at which time he took off towards the front of his car. I fired a second shot and then Mr. Sabatini was finally stopped at the front of the vehicle, at the front of his vehicle, crouched down behind the left front headlight."

Bolvin apprehended Sabatini, brought him to the front of the cruiser, spread-eagled him on the hood and hand-cuffed him. The officer said he then "advised [Sabatini] of his constitutional rights." [2] Bolvin then took him to the rear of the cruiser and "placed him on top of the trunk, the upper extremity of his body on the top of the trunk, to make certain he did not have a weapon and not give him cause to use any weapon against the rest of us that were there on the scene. * * * I grabbed him by * * * his hair and placed his head down on the trunk with my left hand while I had my right hand at his belt and my knee in between his legs." He denied hitting Sabatini but said Sabatini's head could have hit the trunk because he was trying to jerk away, "trying to lift himself back up * * * trying to jerk back * * *." But he observed no signs of injury to Sabatini and Sabatini made no complaints of any injury. Bolvin agreed that he was not "particularly gentle with Sabatini when he put him spread-eagle on the trunk." Other officers had arrived to lend assistance. Sabatini was placed in the back of the cruiser to await the paddy wagon. It arrived shortly and Sabatini was placed in the custody of the two paddy wagon officers, Schachner and Tucker.

When the passenger, Andrews, identified as the actual perpetrator of the robbery, was shot he fell and remained motionless on the ground with his right arm under his

---

2. It was later shown that all the *Miranda* warnings were not then given. The court excluded any statements made by Sabatini to Bolvin at the time of arrest.

body. The police found a gun in his right hand. The gun's clip held 9 rounds and there were 7 live rounds in it. Dowling testified that the gun looked like the one the robber brandished during the holdup. A white hat and a box containing a bottle of whiskey were found in the Chevrolet. Dowling identified the hat as the one the robber wore and the bottle of whiskey as the type the robber purchased. Paper money totaling $488 was found stuffed under the right front seat of the car.

## THE CONFESSION

Detective Ranson Jader McLamb of the Prince George's County Police saw Sabatini in the company of officers Schachner and Tucker about 10:10 p.m. on 14 December at the Hyattsville detective bureau. "He appeared to be subdued. Physical condition, didn't appear to be anything physically wrong with him. * * * he was very quiet; he walked with his head down; don't recall him saying anything." McLamb and Detective Daniel R. Olds interviewed Sabatini. He was given the required *Miranda* warnings, expressly asserted that he understood his rights and said he was willing to make a statement. At this point in McLamb's testimony the jury left the courtroom and a hearing was held out of their presence on the admissibility of a statement given by Sabatini. McLamb testified under examination by defense counsel that Schachner and Tucker, who had brought Sabatini from the place of his apprehension to the police station, turned their prisoner over to him and Olds. McLamb and Olds took him to the interrogation room. McLamb did not recall ever leaving his presence. Olds read the *Miranda* rights to him about 10:25 p.m., and although he expressed his willingness to make a statement a formal waiver was not signed until midnight after his statement had been reduced to writing. Asked: "It was not until 2400 or after the statement was completed that you gave him an opportunity to call a lawyer; is that your testimony?", he replied, "To that point he didn't want a lawyer." Only McLamb, Olds and Sabatini were in the room during the

interrogation. Examined by the State, McLamb was asked if Sabatini was reluctant to give a statement. Mc-Lamb said: "He wanted to talk about it. When he started talking about it, I advised him that I was going to take it in the form of a written statement and that he would be asked at the completion to read the statement, verify its correctness, and to sign the statement." He did read it after McLamb typed it, agreed with it, initialed some typing errors, indicated it was true and correct and signed it and the waiver form. He was not threatened, offered any inducement or promised anything "for his statement." When he was turned over by the paddy wagon officers he did not appear to have been injured in any way. The court made personal inquiry of McLamb. It verified that Olds had informed Sabatini of his rights at the police station. The transcript reads:

> "THE COURT: And did he make any request for either water or a lawyer at that time?
> THE WITNESS: I know he didn't request a lawyer, and as I said about water, I don't recall whether he requested water. If he requested it, he got it.
> THE COURT: Well, he didn't seem to be injured has been your testimony?
> THE WITNESS: No, sir, he did not.
> THE COURT: And did he appear to understand what you were saying to him?
> THE WITNESS: He did, Your Honor.
> THE COURT: And his response was a voluntary response?
> THE WITNESS: Yes, sir, it was.
> THE COURT: And was it to the effect that he understood and was willing to make a statement voluntarily?
> THE WITNESS: Yes, sir.
> THE COURT: Now, we understand there were no threats of any kind made whatsoever?
> THE WITNESS: No, sir.

THE COURT: Prior to the announcement of your statements of his rights, did he volunteer any information whatsoever? Did he make any statement whatsoever?

THE WITNESS: None that I recall. The only thing I believe it did occur before he was advised of his rights, he wanted to know how the police officer was.

THE COURT: Wanted to know how the police officer was?

THE WITNESS: Yes, sir.

THE COURT: It was only after you conducted your ceremony about the rights and so forth that you began to interrogate the defendant?

THE WITNESS: Yes, sir, Your Honor.

THE COURT: And after you interrogated him, did you then reduce it to writing?

THE WITNESS: No, sir, this was done as he was interrogated; as he was making the statement.

THE COURT: In other words, it was being taken down as the interrogation progressed?

THE WITNESS: Yes, sir.

THE COURT: Who took the statement down?

THE WITNESS: I typed it as he was—in the first part of the body of the statement, we asked him to tell us what happened. He gave us a narrative, a paragraph, or a large paragraph, approximately half a page. Then both myself and Detective First Class Olds asked questions in reference to that paragraph and in reference to the details of the incident as we knew them.

THE COURT: Did he ever indicate a reluctance not to give you a written statement or oral statement?

THE WITNESS: No, sir.

THE COURT: And at any time did he stop during the interrogation and request an attorney?

440

THE WITNESS: No, sir, he did not.
THE COURT: Did he appear to be uncomfortable while he was giving this statement; that is, was he physically uncomfortable?
THE WITNESS: The only thing I observed he appeared to be very nervous, fidgety."

The testimony of Olds corroborated that of McLamb. Olds said he gave Sabatini water sometime during the questioning but he did not recall exactly when.

Sabatini testified on the issue of the admissibility of the statement. He gave his version of the circumstances of his apprehension, that Bolvin had shot at him, that he had surrendered, been handcuffed and shoved to the back of the police cruiser. He said:

"As I got to the police cruiser he shoved me down on the police cruiser, which in turn the quarter panel caught me across the ribs, and if I gave any resistance, it was only because of the sharp edge that hit me in the ribs, and then he grabbed me by the head, side—this side of my hair and he pounded my head down on the car, and at the time they were pressing me and several other officers came up and there was several officers at the time going over me. * * * One of them was coming up my leg and grabbing me in my privates and squeezed me. Another one was slapping me in the ribs with a fist, not just a hand, and at the same time my head was being banged down on the car. The only restraint I gave was to try to get the sharpness of this quarter panel, which I am an auto body mechanic and I call it a quarter panel, off of my ribs. It was cutting my ribs. * * * Corporal Bolvin then turned me over to two other officers."

Apparently they were the paddy wagon officers. Sabatini told what they did:

"One officer grabbed me from the back. His name was—they called him Binky is the only name I knew him as, and started shoving me toward what I call the paddy wagon, and he kept pushing me toward and saying, 'Run so I can shoot you. Run so I can shoot you.' And I kept fighting back to keep from running, from falling. So he got me to behind the paddy wagon, and then he had me with one hand trying to push me over this edge so he could shoot me saying 'run.' At this time another officer come around and said, 'Leave him alone, Binky.' This is when I found out his name. He says, 'Let him alone.' Then as they opened the paddy wagon and put me up in the paddy wagon, they kicked me up in the spine and kicked me up into the paddy wagon. Then they closed the doors and they took off and they were speeding, and when they took a turn they take a turn. I was in the back handcuffed behind my back and I was bouncing across inside the wagon. I had nothing to hold on to. No way to steady myself."

He claimed that when he was turned over to McLamb and Olds another officer came along and upon being informed he was involved in the shooting of Nicholls "took an elbow and hit me like that and drove me into the door, through the doorway." Then McLamb and Olds took him to a room and wanted him to make a statement. He told them he did not want to make a statement and wanted to call a lawyer. He asked "to call Mr. DePaul's office. They ignored him. Later he asked for a glass of water but he did not get it. He asked them to take the handcuffs off because he had pains in his ribs and they were cutting his breath off. At first they would not take off the cuffs, but later they did. They read him the waiver of rights forms and he told them he understood but he would rather not make a statement until he talked to a lawyer. He asked for a glass of water and a cigarette.

He was given the water but not the cigarette. They kept asking him to make a statement and finally gave him a cigarette. He made a statement and although reluctant to sign it, he did sign it. "At this time I was just tired and sore, and all I wanted to do was just lay down and go to sleep. I was nervous, my hands were shaking, * * * and all I wanted to do was just be left alone." Only McLamb and Olds were in contact with him during the questioning. On cross-examination it was made clear that while being transported to the police station the paddy wagon officers had no contact with him as he was in the back of the wagon sealed off from them. His complaint was the fast stops and fast starts "throwing me from one side to the other, forward and backward." He admitted neither McLamb nor Olds beat him nor did they threaten him. They did not offer any benefit to induce him to make a statement; they just "pressured" him. He said that he was concerned about the officer who had been shot. On re-direct examination it was elicited that he had been taken to the hospital two or three days later after complaining about pains in his chest. X-rays were taken and medication prescribed, but he never received the medication. "I was refused it because there are certain regulations they have." Upon inquiry by the court he said his reason for making the statement was he "wanted to just be able to lay down and just to get away from the pain of sitting down. * * * I just wanted to get things over with so I could go back in jail and lay down * * * I wasn't physically forced, no, sir."

McLamb testified in rebuttal. He denied that Sabatini had requested to call a lawyer named DePaul or any lawyer, and stated that Sabatini had not complained of chest pains, or any physical pain and had not indicated a desire to go off somewhere and lie down. The officer reiterated that prior to any interrogation Sabatini was fully advised of his rights and said he understood them, that no threats or promises were made to him and that he was not reluctant to submit to interrogation or to sign the written statement.

The court denied the motion to suppress the statement finding that it had been voluntarily made. Over objection it was received in evidence in the presence of the jury.

Sabatini's first attack on his conviction is that the trial court erred in admitting his statement in evidence. He presents two grounds; the State did not prove (1) the chain of custody of him, and (2) the waiver of his *Miranda* rights.

### (1)

As to the chain of custody of him he relies on *Mercer v. State,* 237 Md. 479. There the Court held that the State had not met its burden of proving the voluntariness of Mercer's admissions because it had not rebutted Mercer's testimony that his confessions were the result of force used upon him by two of the interrogating officers; one "smacked him in the mouth", and the other "beared the heel of his shoe" into his foot. These two officers were not called to testify and the officer who did testify was not present during the entire interrogation. At 483-484. Sabatini attempts to apply the *Mercer* holding to the two paddy wagon officers, urging that his testimony about their activities had to be rebutted by the State. We do not agree. Assuming, *arguendo,* that their conduct was what Sabatini described, they played no part whatsoever in the interrogation of Sabatini, not even being present when he was questioned. Any force they may have used and threats they may have made were not directed to the obtaining of a confession, and if they posed a threat to the well being of Sabatini that threat departed with them. We do not think that the failure to rebut the allegations relating to the paddy wagon officers precluded the preliminary finding by the trial court that the confession was voluntary. See *Smith v. State,* 4 Md. App. 146.

### (2)

Sabatini argues that the fact that a written waiver by him of his rights, which he does not deny were told him

through the appropriate *Miranda* warnings, was not signed until after the statement had been obtained, considered together with his testimony "pertaining to his physical and mental condition, his constant demands for an attorney [and] his physical surroundings, rendered the so called waiver a mere perfunctory reading insufficient in law to assure the voluntariness of. the statement." McLamb and Olds testified that he was informed of his rights prior to the start of any interrogation, stated he understood them, expressed willingness to make a statement and did so. We think that the record affirmatively showed that here was a free and voluntary waiver and, on our independent constitutional appraisal thereof, so hold. See *Fowler v. State,* 6 Md. App. 651. The trial court was not obliged to believe his claims of physical discomfort, particularly as refuted by the observations of the officers. See *Carder v. State,* 5 Md. App. 531.

## THE SUBSEQUENT STATEMENT

Testifying in his own behalf, Sabatini averred that he first knew Andrews had a gun when the officer stopped his car. "Andrews stuffed the money under the seat and then I also saw a gun * * * underneath of the money as he went on to put it underneath the seat." Prior to that time that evening he had not seen the gun. "I did not know he had a gun." On cross-examination he said he had seen the gun on one prior occasion but had never handled it. He expressly denied that he had told a detective Taylor that he had handled the gun on several occasions in a hotel room. He denied he had taken it with him on a visit to his wife and denied telling Detective Taylor he had taken it out and showed it to his wife. Once he saw it "laying on top of a dish" in his room and put it in a drawer. He denied that a maid walked in while he was handling the gun and denied telling Detective Taylor that this had occurred.

Detective Thomas F. Taylor of the Prince George's Police Robbery Squad had testified during the State's case in chief without objection that he had interviewed

Sabatini on 17 December, three days after the arrest. "* * * I went to the Prince George's County Detention Center with Detective Sergeant Tom Skaife of the Montgomery County Police Department. At approximately 1515 hours we checked Gary Lee Sabatini out of the jail, escorted him over to the squad room in the Marlboro station, which is downstairs, and talked with Gary Lee Sabatini. He was advised of his constitutional rights by Sergeant Skaife and I indicated to him that his rights also pertained to this case. He said he understood those rights and was still willing to make a statement. Sergeant Skaife was trying to investigate some other activities —." Objection to the last statement was sustained. Taylor continued: "Sergeant Skaife asked some questions of Mr. Sabatini and I also inquired in reference to this particular case, sir." The court granted a motion by defense counsel to strike the testimony "that reflects upon another investigation in Montgomery County" and instructed the jury not to consider it. The matter of statements by Sabatini about the instant case was not pursued.

Following Sabatini's testimony on the general issue the State called Taylor to impeach Sabatini by proof of prior inconsistent statements. *Cooper v. State,* 14 Md. App. 106; *Sanders v. State,* 1 Md. App. 630. Taylor again referred to his conversation with Sabatini on 17 December. Defense counsel objected. The Assistant State's Attorney said: "There is a recent Supreme Court case that holds that even if a statement is otherwise inadmissible, if he takes the stand he can be cross-examined about it and there can be rebuttal evidence." The court said it had "ample latitude in that respect" and overruled the objection. Defense counsel pointed out that the case referred to provided that the statement be "voluntary." He asked for a hearing out of the presence of the jury on the voluntariness of the statement the State proposed to use to impeach Sabatini's testimony concerning the gun. The court apparently did not feel that the niceties of the admission of a confession were involved, asking, "What does this have to do with a confession?" The court

ruled: "We are going to permit it. Overrule your objection." Before the jury Taylor recounted what Sabatini told him:

"At first Mr. Sabatini denied any knowledge of Mr. Andrews having a gun. However, the longer I talked with him he indicated to me that he had in fact known that Mr. Andrews had the gun. I told him that he had been seen with the weapon. He thought for a few minutes and then said, yes, he had been handling the gun in his hotel room. * * * Mr. Sabatini had been handling the gun in his hotel room when one of the maids walked in. After that I then asked him, 'Are you sure that is all?' I said, 'Somebody has seen you too.' Mr. Sabatini indicated to me that during the weekend of December the 6th he had gone to visit his wife at her home in Laurel, Maryland, and Mr. Andrews had gone out of town on some other business and that he had taken that gun with him to his home. He couldn't offer an explanation as to why he had taken it, but he indicated that he had."

On cross-examination it was elicited that Taylor had reason to know that a preliminary hearing involving Sabatini on 15 December had been postponed because there was no counsel representing him. There ensued a hearing out of the presence of the jury, apparently for the purpose of determining whether Sabatini was represented by counsel on 17 December and whether Taylor knew he was represented. It became clear that whether or not Taylor knew Sabatini had counsel at the time the officer "checked him out of the Detention Center", he was told by Sabatini that he had counsel at the very start of the "interview." Taylor said: "I believe that was one of the first things that we covered, that he had a counsel, and I asked him the standard waiver of rights, and he indicated he would talk without his counsel pres-

ent." Sabatini did talk; the substance of what he said was as recounted by Taylor to the jury. On cross-examination Taylor explained that the rights had actually been read to Sabatini by Skaife and that a waiver form had been signed by Sabatini but was in the possession of Skaife. Taylor again said that he explained to Sabatini that the warnings applied to the instant case also. Sabatini was permitted to telephone his wife concerning an attorney. "He was apparently satisfied with the phone call to his wife about the arrangements of his attorney, but he indicated he did not want his attorney there at that time. And we sat down and we talked about things that Sergeant Skaife had and we came back to the robbery, which I was investigating, sir." On cross-examination Taylor specifically denied that he told Sabatini that he was going to prosecute Sabatini's wife for withholding information. "We had discussed his wife briefly at his mentioning about their relationship and trying to get their marriage back together. But that was about all."

Sabatini, testifying on the issue, admitted he had been informed of his rights by Skaife and signed a waiver form but denied that Taylor told him it was applicable to the instant case. "He threatened me that he was going to lock my wife up * * * for withholding evidence, which my wife had never had any part in any kind of crime. She's a hard worker and he really shook me up with it, and I volunteered some information again on the case, the same data. As far as some of the things he said I did not volunteer those. He found those out by investigation himself." He denied he told Taylor he had taken the weapon when he went to see his wife. On cross-examination he admitted he had been informed of his rights by the Montgomery County policeman and that he was familiar with them, aware that he had a right not to say anything without his lawyer being present. He claims he did not telephone his wife until after the questioning. On inquiry by the court he said he voluntarily waived the right to have his lawyer present for the interrogation by the Montgomery County policeman, and conceded

that Taylor could have been present in the room when he made the waiver, but denied that Taylor told him the waiver applied to the Prince George's case. He said that he had not been subjected to any physical threats "nor was any violence applied to him—" "no, they didn't beat me, no, sir." Defense counsel testified that he was retained by Sabatini on 15 December and the State's Attorney knew of his representation because he conferred with the State's Attorney on that date about the case. Defense counsel said that "at no time was I consulted when two days later [Sabatini] was taken out unbeknownst to me and interviewed by Detective Taylor."

The lower court ruled that Sabatini "had in fact waived his right to have counsel present before any interrogation was made and that any testimony or evidence that was received on that date is admissible in this case." It overruled objection to the evidence and denied a motion for a mistrial made by the defense.

## The Assistance of Counsel Issue

Sabatini first questions the propriety of the lower court's admission of the statement made to Taylor on 6th Amendment grounds. He claims in effect that once an accused is represented by counsel he cannot be questioned out of that counsel's presence absent a waiver by counsel as well as by the accused. He relies principally upon *Massiah v. United States,* 377 U. S. 201, and cites *State v. Fowler,* 259 Md. 95. What *Massiah* held was that a defendant's own incriminating statements, obtained by federal agents listening by surreptitious means to his conversations after he had been indicted and had retained a lawyer, could not, under the 5th and 6th Amendments, constitutionally be used by the prosecution as evidence against him at his trial. We do not construe *Massiah* as holding that an accused may never effectively waive assistance of counsel once he has counsel representing him or that a waiver of assistance of his counsel can never be effective in the absence of waiver also by that counsel. There could be no question of a waiver in *Massiah* as the accused did not even know his incriminat-

ing statements were being overheard by the authorities. In *Fowler v. State,* 6 Md. App. 651, we held a statement obtained when the accused was represented by counsel to be inadmissible. One of the reasons for the ruling was that there had not been an effective waiver of the assistance of counsel. At 673-676. We see nothing in this Court's opinion in *Fowler* or in that of the Court of Appeals in affirming the judgment of this Court upon grant of certiorari, *State v. Fowler, supra,* to preclude an accused intelligently and voluntarily waiving the right to have his counsel assist him during a custodial interrogation. We note that in *State v. Fowler,* at 107, the Court of Appeals registered its approval of the practice of the Baltimore City Police Department in obtaining a waiver from the accused of his rights, as enunciated by *Miranda v. Arizona,* 384 U. S. 436, prior to interrogation. Such practice was not limited by the Court to interrogations in which the accused had no counsel representing him nor did the Court prohibit the proper obtaining of a waiver when the accused had counsel.

We have made an independent constitutional appraisal of the record as is our obligation when a constitutional right is involved. *Herbert v. State,* 10 Md. App. 279, 287; *Gardner v. State,* 10 Md. App. 233, 245.[3] We find that Sabatini intelligently and freely waived his right to assistance of counsel prior to making the challenged statements to Taylor, and that they were voluntarily made. The statements were not inadmissible on the 6th Amendment ground suggested. We hold the lower court did not err in admitting them.

*The Requirement of a Preliminary Determination of Admissibility*

The case referred to without name during the discus-

---

3. See *Fiske v. State of Kansas,* 274 U. S. 380, 385; *Pennekamp v. State of Florida,* 328 U. S. 331, 335; *Stein v. People of the State of New York,* 346 U. S. 156, 181-182; *Blackburn v. State of Alabama,* 361 U. S. 199, note 5 at 205. *Edwards v. State of South Carolina,* 372 U. S. 229, 235; *Haynes v. State of Washington,* 373 U. S. 503, 515-516; *Cox v. State of Louisiana,* 379 U. S. 536, note 8 at 545. And see *Walker v. State,* 12 Md. App. 684, 694-696.

sion below upon Sabatini's request for a hearing out of the presence of the jury on the admissibility of his statements is *Viven Harris v. State of New York,* 401 U. S. 222, 91 S. Ct. 643. In that case no warning of a right to appointed counsel was given before questions were put to the accused when he was taken in custody. Thus, despite that there was no claim that the statements "made to the police were coerced or involuntary," *Miranda* barred the prosecution from making its case with those statements as they were made while in custody prior to having or effectively waiving counsel. But a majority of the Court ruled they could be used in the impeachment of the accused. "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." 91 S. Ct. at 645. We shall follow *Harris,* departing from our holding in *Franklin v. State,* 6 Md. App. 572, cert. denied, Court of Appeals of Maryland, 255 Md. 741, cert. den. Supreme Court of the United States, 399 U. S. 912.[4] We have had the application of *Harris* suggested in two other cases, *Cooper v. State,* 14 Md. App. 106, and *Layman v. State,* 14 Md. App. 215. In neither did we find necessary to resolve the many questions which *Harris* presents, indicated in *Cooper,* note 4, including the necessity of a preliminary determination by the trial court of the admissibility of admissions which the prosecution seeks to introduce into evidence. See *Jackson v. Denno,* 378 U. S. 368; *Lego v. Twomey, supra.* In *Barnhart v. State,* 5 Md. App. 222, 223-227, we discussed the procedure with respect to a preliminary decision by the trial court on the admissibility of a confession to be used by the prosecution in its case in chief. We observed that even though it was prudent to hear evidence on the preliminary question of vol-

---

4. In *Franklin* we held such statements could not be used in impeachment, a conclusion also reached prior to *Harris* by six federal Courts of Appeal and appellate courts in thirteen other states.

untariness out of the presence of the jury, it was not reversible error not to do so when the confession was properly admitted. *Id.,* at 226.[5] Even if the procedural rules concerning the admission of statements used as substantive evidence of guilt are equally applicable to statements used to impeach, there was no reversible error here. It is true that the trial court had not decided that the challenged statement was voluntary at the time it was admitted. But it thereafter, at least implicitly, so found by holding it admissible after hearing evidence going to the point. We have concluded as set out above that the statements were voluntarily made, assistance of counsel being effectively waived and the evidence being sufficient to show that Sabatini was not coerced, threatened or unconstitutionally induced by hope held out or promise made. If there be a distinction between "voluntary" and "trustworthy" within the contemplation of *Harris,* our independent appraisal of the entire record is that the trustworthiness of the evidence satisfied legal standards as well.[6] There being no obligation to believe Sabatini's denials, we see nothing in the record to indicate that his statements to Taylor did not warrant trust and were other than dependable as well as arising from his own free will. Sabatini voluntarily taking the stand on the general issue "was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." *Harris* at 645-646.

---

5. On the other hand, it would be reversible error in such circumstances if the confession was inadmissible even though it was excluded and the jury instructed not to consider it. *Ibid.*

6. "Trustworthy"—"warranting trust; dependable; reliable." The American Heritage Dictionary of the English Language. We can conceive of a statement which would be "voluntary" as not coerced or induced by the authorities but not "trustworthy", as when a compulsive confessor admits to a crime which in the circumstances he could not have committed. And note 2 at p. 646 in the majority opinion in *Harris* gives an example where a confession could be "trustworthy" although its "voluntariness" would be "totally irrelevant." And see *Rogers v. Richmond,* 365 U. S. 534 in which "voluntary" and "trustworthy" in the frame of reference of confessions seem to be distinguished.

We hold that his credibility was appropriately impeached by use of his earlier conflicting statements.

## THE SUFFICIENCY OF THE EVIDENCE

The evidence clearly established the *corpus delicti* of the robbery with a deadly weapon and Sabatini's contention that the evidence was not sufficient to sustain his conviction goes only to his criminal agency. His version of what happened as recounted on direct examination before the jury was that he drove Andrews to the vicinity of the liquor store so Andrews could transact some business, that he did not know where Andrews went, that he parked in a residential section and sat in the car waiting for Andrews to return, that when Andrews returned well over a half an hour after he said, "Let's go" and they drove onto U.S. 1 heading north. Sabatini suggested they stop for a drink but Andrews said he "didn't particularly feel like stopping for a drink." Sabatini pulled into a place called the Red Rooster. Andrews did not like the looks of the place so they got back in the car and proceeded north on U.S. 1. When the officer pulled out to follow them Andrews pulled some money out of his pocket and put it under the seat. It was then Sabatini first saw the gun. Sabatini said on cross-examination that he had bought the car two days before, on 12 December, from a friend "who runs a used car lot." He paid $150 for it and Andrews paid half although the car was titled in Sabatini's name. Andrews paid half because Sabatini was going to work for him. He knew Andrews was going into a liquor store to transact the business but did not know it was to be "an actual armed robbery." He thought it was a "set up." He admitted that Andrews told him where to park and that Andrews "didn't want me seen with him at any time anywheres." He denied he knew the rear license tag had been covered over.

The statement Sabatini gave to McLamb and Olds explained about the "set-up." After telling how he had met Andrews, he narrated what occurred the night of the robbery:

"This evening [Andrews] he came by and asked me how I was doing for money and I told him I had about Eighty dollars. Then he asked me if I would like to make a couple of hundred dollars. He told me he had it set up with a guy in a liquor store to hold him up. He would get about a thousand dollars. The guy was going to turn it in to his insurance company about three or four thousand dollars. Then we went out there. I stopped on the street and he went in the liquor store. Then he came out and we started up the road and the policeman stopped us."

We cannot say that the trial court was wrong in denying Sabatini's motion for judgment of acquittal made at the close of all the evidence. We think that the evidence was sufficient in law for the jury to find that Sabatini had driven the actual perpetrator of the robbery to the place of the crime and away from it after the robbery, that his being at the crime scene was more than mere presence, as he was acting as a look-out and the driver of the getaway car and so was aiding and abetting the commission of the robbery. *Thomas v. State,* 2 Md. App. 502. He was thus a principal to the felony, and that he was a principal in the second degree rather than the first degree was not material. *Agresti v. State,* 2 Md. App. 278. See *Butina v. State,* 4 Md. App. 312. The trial court was no more obliged to believe the explanations and denials of Sabatini in considering the motion for judgment of acquittal than was the jury as the trier of fact when the evidence was submitted to them. *Williams v. State,* 5 Md. App. 450.

## COMPETENCY OF TRIAL COUNSEL

Sabatini would have us declare that his trial counsel was incompetent. The point was not tried and decided below and we do not consider it. Maryland Rule 1085; *Boswell and Poe v. State,* 5 Md. App. 571, 583.

*Judgment affirmed.*