# STEWART ELLSWORTH BAILEY LAYMAN, JR.
## v. STATE OF MARYLAND

[No. 317, September Term, 1971.]

*Decided January 31, 1972.*

The cause was argued before ANDERSON, POWERS and CARTER, JJ.

*George F. Paxton* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *William M. Cave, Deputy State's Attorney for Montgomery County,* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

Stewart Ellsworth Bailey Layman, Jr. was indicted jointly with two codefendants, by the grand jury of Montgomery County, charging that on March 25, 1970, with a dangerous and deadly weapon, they robbed Frank J. Katen, Sr. of several thousand dollars in money, the property of Frank J. Katen, Sr. and Laurese Byrd Katen, and that they assaulted Laurese Byrd Katen.

Layman was separately tried, on March 11, 1971, before Judge H. Ralph Miller and a jury in the Circuit Court for Montgomery County. He was convicted of both charges, was sentenced, and he appealed. Here he contends that it was reversible error for the trial court to:

1. Refuse to exclude an in court identification by Mrs. Katen.
2. Refuse to exclude an in court identification by Mr. Katen.
3. Refuse to grant a requested mistrial after Mr. Katen testified he could identify appellant.
4. Deny appellant's motion for judgment of acquittal.
5. Rule that if appellant testified the State would be free to impeach him with a confession previously ruled to be inadmissible.
6. Refuse to hold a hearing on the voluntariness of that confession, out of the presence of the jury.

### *The Robbery*

The evidence showed that Mr. and Mrs. Katen operated a numismatic business in a studio adjoining their home in Silver Spring. On March 25, 1970, a young man came in and discussed proof coins with Mr. Katen. He was shown several sets, and examined them for three or four minutes. As two other men entered the studio, with guns in their hands, the first man took a gun from his pocket and ordered Mr. Katen to put up his hands. One of the men walked into the kitchen and confronted Mrs. Katen, who was sitting at a table. He pointed the gun at her stomach, and ordered her to go into the studio. As she complied, he followed, with the gun at her back. The three men were there about 45 minutes, dumping coins into suitcases. They had tied both Mr. and Mrs. Katen with cords cut from the venetian blinds, and had tied towels over their heads.

The money taken was alleged to have a face value of $3,350.00, but Mr. Katen testified that the value was about $15,000.00. Before the robbers left, they went through the house and cut all telephone lines. Mrs. Katen untied her own bonds and freed her husband. The robbery was reported by telephone from the house next door.

### The Identification of The Appellant

Prior to trial, appellant had filed a motion to suppress any in court identification of him as a participant in the robbery by either of the victims. It appears to have been accepted by all concerned that Mr. Katen could not make such an identification, but that Mrs. Katen was expected to do so. The motion was heard on the day of trial, out of the presence of the jury, before any testimony was taken on the issue of guilt.

Appellant contended that any identification Mrs. Katen might make was tainted because she saw appellant at a preliminary hearing, and was suspect because of prior photographic viewings by her.

Mrs. Katen testified, at the hearing on the motion, that when she was shown a group of photographs, she "tentatively" identified one of appellant as the robber who came into the kitchen and pointed the gun at her. She considered that identification tentative because the man in the photograph had a beard, and the robber did not have a beard. She also said that at a later photographic viewing, "I saw another one which was definitely him".

As to the confrontation at the preliminary hearing, Mrs. Katen was questioned by William M. Cave, Esq., Deputy State's Attorney, as follows:

"Q When did you first see Mr. Layman on that morning?

A At the preliminary hearing?

Q Yes, ma'am.

A When they brought these people in, and he was handcuffed.

Q They brought them in, I assume, through a door?

A Yes.

Q Were you looking at the door when they came in, if you recall?

A I don't know at the moment, but I looked up naturally, to see what was going on, because

this was an all new experience to me; and I was looking all around and making observations.

When I looked up and saw these people handcuffed, I took a second look and knew that was him.

Q Did anybody indicate to you that was Mr. Layman?

A No.

Q Who was sitting next to you at the time?

A My husband.

Q What, if anything, did you say to him?

A I just nudged him, and I said, 'That's him.'

Q Prior to this, had anybody told you that, 'You go sit down, and they will bring him in and you will see him'?

A No, I hadn't spoken to anybody about who was going to be brought in, when or where.

Q And does your recollection, identifying the Defendant, come from the occurrence of the robbery back in March, or from September 17, 1970?

A Well, the minute he walked in, I knew that was him. There was no question in my mind."

Appellant testified at the hearing out of the jury's presence that he was brought into the courtroom for the preliminary hearing handcuffed to two other men, one a black man, and they were seated on a bench. He said that while he was sitting there his name was called out, and a detective took him out of the room for a telephone message.

Judge Miller denied the motion to suppress evidence of identification of appellant. Before the jury, Mrs. Katen testified:

"A * * * the door opened and this person appeared with the gun in his hand and stuck it right out at me and said, 'Get up, lady,

and go in the other room where your husband is; and you won't get hurt.'

So, I didn't say a word. Naturally I got myself up and walked in the other room, and he got in back of me with the gun in back of me and followed me all the way in around the counters in the back and asked me to sit down, kneel down and at which time I did ask for a chair; and he shoved a chair under me.

He said, 'Just keep still and don't turn around;' and then they proceeded, of course, then to tie us up; and in a little while, they got some towels and put them over our heads while we were robbed and things went on from there.

Q Now, during the course of that confrontation, are you able to tell us whether or not you were able to get a good look at the individual that held the gun on you?

A No, he walked in the kitchen; and there was a gun stuck practically in my stomach. I got a good look at his face. I got a good look at his eyes.

Q Do you see anyone here in court today?

A Yes.

Q Would you point him out?

A Stewart Layman.

Q You are pointing, I believe, to the Defendant?

A Yes.

MR. CAVE: May the record indicate that the witness had identified the Defendant, Stewart Layman.

THE COURT: All right. The record will indicate.

BY MR. CAVE:

Q I ask you to think very carefully and reflect

on the answer. Is there any doubt in your mind whatsoever that that is the man?

A There is no doubt in my mind at all. That is the man that put the gun right at me."

In *Smith and Samuels v. State,* 6 Md. App. 59, 250 A. 2d 285, in discussing *Stovall v. Denno,* 388 U. S. 293, we said, at pages 65 and 66:

"But the Court said that it was a recognized ground of attack upon a conviction, independent of any right to counsel claim, that a pre-trial confrontation was 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law. Such a claimed violation of due process of law depends on the totality of the circumstances surrounding it. Although the Court recognized that the circumstances of a confrontation may result in a denial of due process of law, it found, on the totality of the circumstances surrounding the confrontation there, that due process had not been denied. It did not enunciate exclusionary rules applicable when there is such a denial, but we think it follows that when a confrontation is illegal, whether by the denial of the constitutional right to counsel or the constitutional right to due process of law, the same exclusionary rules would apply. We hold that when a pre-trial confrontation is found to be illegal by the denial of due process of law, the exclusionary rules, enunciated in *Wade* and *Gilbert,*[1] as hereinbefore set out, are applicable."

We have reviewed our holding in *Coleman v. State,* 8 Md. App. 65, 258 A. 2d 42, cited by appellant. We said in that case, at page 74:

"We hold that the confrontation at the pre-

---

1. *United States v. Wade,* 388 U. S. 218, *Gilbert v. State of California,* 388 U. S. 263.

liminary hearing, in the circumstances, was so impermissibly suggestive as to violate the appellant's Fourteenth Amendment right to due process of law."

But the circumstances there were very different from those here. In *Coleman* the witness failed to identify the accused in photographic viewings and at a lineup, and did identify him at the preliminary hearing only after he was brought, alone, before the judge, identified by name, and the charges against him were read. In the present case, the evidence showed that Mrs. Katen recognized appellant immediately upon his entry into the room, with other persons, and before he was in any way singled out as the person accused.

When an appellant asserts a denial of his constitutional right to due process of law, we do not accept a conclusion of the trial judge merely because it is not clearly erroneous, but rather we make our own judgment of the facts based upon an independent, reflective constitutional appraisal of the entire record, *Walker v. State,* 12 Md. App. 684, 280 A. 2d 260. We have made such an appraisal of the facts here, and we conclude that there was no pretrial taint of Mrs. Katen's identification evidence, and that Judge Miller correctly ruled that such evidence was admissible before the jury.

### Mr. Katen's Testimony and the Denial of the Motion for a New Trial

Mr. Katen described the robbery to the jury. In his direct examination by the Deputy State's Attorney, this took place:

"Q And did you notice anything about any of the individuals insofar as size, shape?

A Yes, I did, particularly the one I observed across from me for three to five minutes. We will say I knew him very well. I was able to identify him later."

* * *

"Q So that we are clear, that man is not the Defendant?

A That first man, no, is not the Defendant.

Q What about the other two? Did you notice anything about them?

A Yes, there I caught a fleeting glimpse. In other words, the time it takes for me to get up to my chair and observe two men coming in, both with pistols, and the one on my left, closer to the kitchen door, was the Defendant.

Q And what occurred after that?

A Well, by the time I got up, fully straightened up and put my hands above my head, he started to go into the kitchen. Then I saw Mrs. Katen.

Q You say 'he.' Who are you referring to?

A The Defendant now."

Appellant's counsel, at the bench, took the position that it had been understood that Mr. Katen could not identify appellant. The State conceded the point, and offered to clear it up. Appellant moved for a mistrial, which was denied. This followed before the jury:

"BY MR. CAVE:

Q I would like to digress for just a minute and ask you, you are not able to positively swear that this is the man that you saw on that day, is that correct?

A I will agree to that.

THE COURT: All right, now, the jury will disregard all reference which this witness made to the Defendant as identifying him as one of the men that came in, because he just said he is unable to do that."

It is by no means clear that the witness intended his comment to be an identification of appellant as a participant in the robbery. We think that any prejudice which

could have resulted from it was removed by the subsequent question and answer, and by the court's admonition to the jury.

### Sufficiency of the Evidence

Appellant bases his contention that the evidence was insufficient and that his motion for judgment of acquittal should have been granted upon the premise that Mrs. Katen's testimony identifying him should have been excluded.

We have determined that the identification was properly admitted. With it, the evidence was clearly sufficient, and dictated the denial of the motion for judgment of acquittal.

### The Use of Appellant's Confession for Impeachment

The record indicates that shortly after his arrest in July, 1970, appellant made a statement to the police, which was referred to as a confession. In December, appellant filed a preliminary motion to suppress the statement. The State answered the motion, and it was set for hearing. No record of the hearing is before us, nor are we told what the statement said, but in neither case is the information required. The docket contains an entry, dated January 15, 1971:

> "Defendant, Stewart Ellsworth Bailey Layman, Jr.—Motion to Suppress Granted by the Court, Judge Miller, with the Consent of the State, Mr. Whitman reporting."

Further explanation of the reason for suppression is found in a colloquy which was recorded during the hearing out of the jury's presence on the question of identification. The following occurred:

> "THE COURT: Why didn't you have a line-up?
> THE WITNESS: (Detective Corporal Ronald W. Scott, Montgomery County Police) Because we had a full confession, Your Honor.

THE COURT: You had a full confession?

THE WITNESS: Yes, sir.

THE COURT: What kind of a confession?

THE WITNESS: A full confession on the Defendant's part that he participated, that he named his co-defendants. He indicated that he would be more than willing to testify for the State against his co-defendants in this case. We did not think it was necessary, Your Honor.

THE COURT: You relied strictly on the confession; is that right? Or was that Detective Sweat that relied on it?

THE WITNESS: Well, no, sir, it was I who obtained the confession. Under those circumstances, I am afraid we did rely completely on the confession.

THE COURT: What was wrong with the confession; do you know that?

THE WITNESS: What was wrong with it?

THE COURT: Why isn't it being used?

THE WITNESS: I can only assume, Your Honor.

THE COURT: Well, go ahead and make an assumption. Tell me what is wrong.

THE WITNESS: That there was a promise of a concurrent sentence with anything he might receive in Virginia.

THE COURT: Who made that promise?

THE WITNESS: Who made that promise?

THE COURT: Yes.

THE WITNESS: I did with authorization.

THE COURT: From who?

MR. CAVE: From me, Your Honor.

I believe this was heard before Your Honor on a motion to suppress the confession which the State stipulated that it would be suppressed.

If I may proffer for the record, Detective

Scott called me prior to going over to Baltimore.

There had been a previous discussion of the request of this Defendant with the Virginia Police Department.

There apparently had already been representations and promises made by Virginia. As a result of that, Detective Scott informed me of that. I felt it would be more beneficial to get the names of the other co-defendants, irrespective of the fact it may be an inadmissible confession; and that was the authorization which he referred to."

After the State had rested its case, there was a colloquy at the bench, a part of which is quoted:

"MR. PAXTON: (Counsel for Layman) I would like a ruling from the Court as to whether or not the Court would permit the State to impeach Mr. Layman if we put him on the stand, based upon his prior confession.

THE COURT: I certainly will. That is a new court rule under the United States Supreme Court.

They made the decision last week.

MR. PAXTON: That decision is based entirely upon the Miranda case, and the Court in Harris versus United States, the Court sets out in detail that there was no question raised concerning the voluntariness of the confession.

The confession of Mr. Harris was secured when he was not properly advised of his Miranda rights, and the Court goes into great length to say that we will permit an impeachment when a person has not been advised of his rights; but they specifically draw the line between a Miranda warning

and a case where a confession is involuntary.

It is my contention, the confession secured in this case was involuntary because of the representations made by the State, that it was the basis of the State's admission.

THE COURT: What do you have to say about it?

MR. CAVE: Well, I would say if he puts him on the stand, I would intend to.

THE COURT: You will what?

MR. CAVE: I would intend to use that confession for the sole purpose of impeachment.

THE COURT: There is some merit to what Mr. Paxton says."

\* \* \*

"MR. CAVE: This language is far stronger than that. One, I definitely would intend to use it."

\* \* \*

"I will bring in Detective Scott out of the presence of the jury to establish the reliability of that confession and corroborate the facts that this Defendant knew to establish the truthfulness of his confession. I would proffer to the Court that I am completely satisfied of the truthfulness of his confession; but I say to the Court and indeed, at the time of the motion to suppress the confession, I had no doubt because of the representations originally made by the Virginia police, that I could not even attempt to introduce it in the State's case-in-chief; but I would have no hesitancy at all about attempting or proffering to use it for impeachment purposes or as a basis of any perjury indictment."

\* \* \*

"MR. CAVE: My understanding is the Court

228

must determine the reliability of that confession and the voluntariness of it.

THE COURT: That is the way I read it, but I could be wrong."

* * *

"THE COURT: Well, the Court will probably permit it; but I would have to hear the facts before I decide.

MR. PAXTON: I think we are getting into the position where I obviously cannot call the Defendant, running the risk of having a confession.

THE COURT: That is up to you."

* * *

"MR. PAXTON: Before Your Honor takes a break, if at all possible, I would like to have a definite ruling on whether or not—

THE COURT: All right. I will rule on it.

MR. PAXTON: Either that, or if Your Honor feels it needs further evidence, I would like to present some.

THE COURT: I will rule right now that unless it is shown that the statement was completely involuntary, I will let it in to impeach him.

Now, the mere fact that some promise may have been made along the way may or may not make it involuntary.

I cannot tell that until I hear all the facts; but you put him on, you are running the risk.

MR. PAXTON: In that case, we would have to have another hearing out of the presence of the jury.

THE COURT: No, no.

MR. CAVE: You put your man on.

THE COURT: Because there is no question until you put him on the stand."

The then recent decision of the Supreme Court which was the subject of this discussion was *Harris v. New York,* 401 U. S. 222, 28 L.Ed.2d 1, 91 S. Ct. 643, decided February 24, 1971. The Supreme Court approved the use, for impeachment of a testifying defendant, of a statement made by him to police under circumstances rendering it inadmissible to establish the prosecution's case in chief under *Miranda v. Arizona,* 384 U. S. 436. The Court pointed out that there was "no claim that the statements made to the police were coerced or involuntary", and said:

"It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."

The question which might have confronted the trial judge was whether the trustworthiness of appellant's confession satisfied legal standards. He did not reach that question; therefore we do not reach it. Maryland Rule 1085. Indeed, there is no record upon which we could consider it. Nor need we decide whether *trustworthiness* which *satisfies legal standards* is in all respects synonymous with *voluntariness.*

We do consider and decide two questions. They are:

A. Was the pretrial order suppressing the confession final and binding for the entire case, foreclosing any reconsideration?

B. Was the judge required to make an anticipatory ruling when requested by the accused, before the necessity to make the ruling had arisen?

### A.

In *McChan v. State,* 9 Md. App. 317, 322, 264 A. 2d 133, we observed that a trial judge was not obliged to hear and determine a motion already fully heard and determined, and it was not error for him to refuse to do

so in that case. In *Walker v. State,* 12 Md. App. 684, 689, 280 A. 2d 260, we held that while a trial judge may accept a pretrial finding on admissibility of a confession, he need not feel bound by it.

It has never been doubted that a judge presiding at a trial, unless specifically precluded, is free at any time during the trial to reconsider any prior ruling in the case, whether made by him or by another judge. Indeed, the power to do so extends so far as the granting of a new trial to correct the effect of a ruling, considered retrospectively to have been erroneous.

We note that Maryland Rule 729 was adopted to govern the procedure for determining the admissibility in evidence of property alleged to have been unlawfully seized, and the Rule specifically provides that if the evidence is suppressed prior to trial, the ruling is binding upon the State. It may be said that if a judge did not have the power generally to reconsider prior rulings, such a provision would have been unnecessary.

For application of a comparable principle in a civil case, see *Hensley v. Pirzchalski,* 212 Md. 471, 129 A. 2d 691, where the Court of Appeals said, at pages 474-475:

> "The appellant argues that because a demurrer to his amended declaration was overruled by one Judge of the Supreme Bench, the different Judge who presided at the trial was required, as a matter of law, to let the case go to the jury on the evidence sustaining the allegations of the declaration. * * * There is no merit in this contention of appellant and the trial judge was free to rule on the case as the facts testified to presented it to him."

## B.

Judges possess a wide discretion in the conduct of trials, and whether to rule in advance on the admissibility or use of evidence not yet tendered is within the scope of that discretion. In 88 C. J. S., Trial, § 145, it is said:

"The court need not rule on objections to evidence until it is offered; and, whether evidence shall be ruled on before it is actually given is within the discretion of the court * * *."

We are satisfied that the question of whether appellant's confession could be used under the ruling in *Harris v. New York, supra,* to impeach his credibility if he testified was open for consideration or reconsideration by the judge, and that he was not required to consider the question until it arose.

*Judgments affirmed.*