## STEPHEN FRANKLIN *v.* STATE OF MARYLAND

[No. 1181, September Term, 1975.]

*Decided December 1, 1976.*

The cause was argued before FREDERICK J. SINGLEY, JR., Associate Judge of the Court of Appeals, JAMES F. COUCH, JR., Associate Judge of the Seventh Judicial Circuit, and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, all especially assigned.

*Robert B. Levin, Assigned Public Defender*, with whom were *Frank, Bernstein, Conaway & Goldman* on the brief, for appellant.

*Deborah K. Handel, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City*, and *Dana*

*Levitz, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

SWEENEY, J., delivered the opinion of the Court.

On September 8, 1975, Stephen Franklin was convicted of attempted robbery with a dangerous and deadly weapon by the Honorable Paul A. Dorf, sitting without a jury in the Criminal Court of Baltimore. He was sentenced to 20 years incarceration.

Franklin now attacks his conviction, asserting that his constitutional rights were infringed because the trial court failed to make a preliminary or subsequent determination of the voluntariness or trustworthiness of certain extrajudicial statements attributed to him, which were introduced by the State for impeachment purposes. Franklin also alleges that the court erred in permitting a police officer to testify as to his silence when he was asked certain questions by the officer.

The State's primary witness was a taxicab driver, Jarrett Christian, who testified that he had picked up the Appellant and two young girls at Pennsylvania Avenue and Laurens Street in Baltimore City at approximately 9:30 p.m. on December 19, 1974. Christian testified that the females left the cab at Ashburton Street and North Avenue, and that the Appellant then directed him to drive to a certain address on Spaulding Avenue. When they arrived at that address, according to Mr. Christian, the passenger got out of the cab and knocked on several doors and then returned to the cab, walking around in front of it with his hands in his pockets and saying to him "you know what this is . . . give it up." Christian stated that he responded by attempting to flee, driving his cab up an alley at a high rate of speed, striking a pole as he did so. While driving away, he heard several gun shots and saw that the windshield of his taxi had been struck by a bullet. Christian then jumped out of the cab and fired a pistol at his assailant, but did not know if any of the bullets struck him. He notified police of the attempted robbery, and after two policemen came to the scene and spoke to him, drove his cab back to his garage. On his arrival

at the garage, he was advised that two detectives wanted to see him at Sinai Hospital. He arrived at the hospital, he said, about an hour after the shooting incident and there he identified the Appellant, who was being treated for a gun shot wound, as the man who had been a passenger in his cab and who had attempted to rob him. In court, on the day of trial, Mr. Christian identified the Appellant as a person who "looked like" his passenger on the day of the shooting. No objection was made to the admissibility of this in-court identification.

The State's second and last witness in its case in chief was Detective John Grimes of the Baltimore City Police Department, who testified that on the date in question he received a call directing him to go to the scene of a taxicab holdup in the 3000 block of Garrison Avenue. On arriving there he found the cab driver, Mr. Christian, who made a report to him. Grimes stated that he then canvassed the area for possible suspects, without success. Approximately an hour later, he heard a call over the police radio advising that a man was being treated for a gun shot wound at Sinai Hospital. He went to the hospital where, he stated, he "observed the defendant here sitting in the emergency room," being treated for a gun shot wound of the left shoulder." He said the Appellant was then dressed in hospital clothing, with his own clothing piled up nearby. Grimes testified further that he determined that none of that clothing, which consisted of a three-quarter length brown leather jacket, and a shirt, contained any bullet holes.

During Grimes' testimony he attempted to describe his conversation with the Appellant at the hospital, and the following colloquy ensued:

"Q What did you do after viewing the Defendant and looking at his clothes?

A I interviewed the Defendant at that time. Not as a Defendant. I asked him what — how he got shot.

Q And what did he say?

A He stated that he —

MR. MEYERS: Objection.

THE COURT: Is there any objection? What's the purpose of the objection, the reason for the objection?

MR. MEYERS: Well, Your Honor, there has been no testimony that the Defendant was advised of his rights before the interrogation.

THE COURT: No testimony that it is an interrogation.

MR. MEYERS: Well, he is asking questions, and he hasn't advised the Defendant he has a right to counsel and so on.

THE COURT: Well, there has been no objection as to an oral confession.

MR. MEYERS: Well, here he is getting into a statement made by the Defendant. I don't believe what it is going to be, but I think —

MR. LEWIS: Your Honor —

THE COURT: I'll let you qualify at this point of time, not qualify as to whether it's custodial interrogation or not.

MR. LEWIS: To avoid the problem, we will withdraw the question at this time.

THE COURT: Routine investigation, not custodial interrogation. All right. Question withdrawn."

Grimes then testified that after talking to the Appellant, he called communications and asked to have the cab driver come to the hospital. He stated that when Mr. Christian arrived at the hospital he "observed the Defendant and stated, that is the man that tried to hold me up". Grimes testified that he then went to an address at 4900 Queensberry Avenue, where he was given certain articles of clothing by the Appellant's sister. He identified those articles as a jacket and a sweater and said that each contained bullet holes. He testified further that he examined Mr. Christian's taxicab and found several "indentations" on the cab: one in the windshield, one in the side and one in the

rear. After introducing certain medical records of the Appellant from Sinai Hospital, the State rested its case-in-chief.

Appellant then made a motion for a judgment of acquittal, which was denied, after which the Appellant elected to testify in his own defense. In his direct testimony, Franklin stated that on the evening in question he was on Pennsylvania Avenue preparing to go home because he felt "kind of sick". "I take epileptic medicine, and I was slightly intoxicated, just a little bit." He said he got into a conversation with two girls, told them he had only "a dollar and something", and that they offered to take him home by cab. In the 2700 block of North Avenue, he said, the girls got out of the cab "giggling, you know, so I'm stuck in the cab". He said he told the cab driver to keep going, in the hope that he would see someone who could give him the cab fare, but was unsuccessful in that effort. He then told the driver to take him to a friend's home on Spaulding Avenue, but no one answered at that address. He testified that when he went back to the cab, the driver pointed a gun at him:

> "A. He had a pistol at my face, you know. Right there I panicked, because I was shot twice. This is the third time, you know, I ran down the alley. About a second later I heard five shots. I was hit with one of them. I scared. I stopped at Garrison. He came through with the cab, and then he stopped, said, 'Come out behind them bushes, I see you.' Is it all right if I say what he said? 'You behind them bushes, you black mother-fucker, come out.' So I came out. 'I got one dollar, something. I live right around the corner, Queensberry, which I did, you know. You go around the corner, you get the rest of your money.' He said, 'No, just throw the dollar across the hood, or I'll kill you.' You know. So I threw the dollar across the hood. My sister take me to the hospital. I took off the bloody shirt I had on, you know, and then I put another on, and my sister threw a leather coat, she put that on. I got down to

the hospital, and I was treated. Then he came in. The cab driver came in. He said, 'Is that the one?' He said, 'yeah,' and ran right back out, you know. The officer right there he questioned me where my pistol at, but I don't own no gun. That's how everything went, you know.

Q. Did you have a pistol with you that night?

A. No, I don't own no pistol.

Q. Did you attempt to hold up the cab driver?

A. No.

On cross-examination, Franklin testified concerning his interrogation by Det. Grimes:

"Q. Now, when the officers came to see you at the hospital, what did you tell them happened?

A. I told them I got shot.

Q. And, how did you get shot?

A. Cab driver shot me.

Q. Didn't you tell them that you had gotten in an argument down at Park Circle and Park Heights, and as a result of that, you had been shot?

A. I don't know nobody there.

Q. So what exactly do you recall telling the officer?

A. That I got shot by a cab driver.

Q. And did you give a reason why you were shot?

A. I told them everything like I am telling you all.

Q. Which is — repeat again what you told the officer, please.

A. Right.

Q. Repeat it.

A. I told them I got shot by a cab driver. You want me to repeat my statement as far as getting out the cab and running stuff?

Q. It's your testimony then that you did not tell the officer that you were involved in a fight, someone shot you as a result of a fight?

A. Yes, sir."

After Franklin's testimony, the defense rested and the State then recalled Det. Grimes in rebuttal. Grimes testified as follows:

"Q. Detective Grimes, when — you previously testified that you went to the hospital and spoke with the defendant about this crime. How did he say it occurred the first time you spoke with him?

A. I asked him how he got shot.

MR. MEYERS: Objection.

THE COURT: Overruled. I'll let it in for impeachment purposes only at this time.

THE WITNESS: He stated that he was in a fight at Park Circle with another subject and he got shot in the back. That is when I questioned him about the clothes. He stated he came right from Park Circle to the hospital. That's why I questioned him about the hole, why there was no bullet holes in his clothes.

Q. And how did he explain that?

A. He couldn't.

Q. Did he say what the fight was about?

A. No. I don't remember.

Q. Did he at any time tell you he was shot by a cab driver?

A. No.

MR. LEWIS: No further questions."

This case presents us with a legal question of considerable complexity, and one that is made all the more complicated and difficult because of the sparse record before us. From this record, it is difficult for us even to ascertain whether we are dealing with a custodial interrogation required to be conducted under the guidelines set out in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), or whether the conversation between Detective Grimes and the Appellant was a noncustodial interrogation which, under

*Cummings v. State,* 27 Md. App. 361, 341 A. 2d 294 (1975), *Tillery v. State,* 3 Md. App. 142, 238 A. 2d 125 (1968), and a host of other cases, would be outside of the ambit of *Miranda.* See *Lamb v. U.S.,* 414 F. 2d 250 (1969); *People v. Phinney,* 22 N.Y.2d 288, 239 N.E.2d 515 (1968); *New Jersey v. Zucconi,* 50 N. J. 361, 235 A. 2d 193 (1967).

The State's decision not to pursue its efforts to present evidence of this conversation as part of its case in chief gives strong indication that the State was fearful that this evidence might be inadmissible as being violative of *Miranda;* but the point is not one of primary concern as, for whatever reason, the evidence concerning the conversation was ultimately offered only in rebuttal, in an effort to impeach the Appellant's own testimony.

Prior to the decision of the Supreme Court of the United States in *Harris v. New York,* 401 U. S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971), whether *Miranda* was applicable to testimony concerning the conversation between Grimes and Appellant would have been totally dispositive of the question, for prior to *Harris* the rule in Maryland was that enunciated in *Franklin v. State,* 6 Md. App. 572, 252 A. 2d 487 (1969), where, at 579, we said:

> "If the veracity of an accused testifying in his own behalf is to be attacked by a prior inconsistent or contradictory statement made while he was undergoing a custodial interrogation, the State must affirmatively show that the statement was made after the accused had been fully advised of all of his rights and had effectively waived them in accordance with the standards prescribed in *Miranda.*"

*Harris,* however, required a material change in the Maryland rule, for in *Harris* the Court held that a statement made by the accused, even though inadmissible in the state's case in chief because of a violation of *Miranda,* may, nevertheless, be used for impeachment purposes. Harris was accused of unlawfully selling heroin. At trial the state made no effort in its case in chief to use statements made by

Harris to police officers immediately after his arrest, conceding that those statements were inadmissible under *Miranda*. Harris, however, like the Appellant in the instant case, elected to testify in his own defense, and on cross-examination he was read certain statements, contradictory of his testimony at trial, and asked whether he had made those statements to police officers immediately following his arrest. In response, Harris testified that he could not remember virtually any of the questions asked of him by policemen after his arrest, nor his answers to those questions. Harris was convicted and his conviction was affirmed on appeal. The Supreme Court granted his petition for certiorari and affirmed that conviction. Mr. Chief Justice Burger, delivering the opinion of the Court, said "[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." 28 L. Ed. 2d 4. The Court went on to say that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." Four justices dissented, stating that the opinion represented at least a partial reversal of *Miranda* and asserting that the state should be no more free to use unconstitutionally obtained evidence in rebuttal than in its case in chief.

Since the decision in *Harris* the Court has not amplified in any detail what is meant by the proviso "that the trustworthiness of the evidence [must satisfy] legal standards", although the phrase was repeated in *Oregon v. Hass*, 420 U. S. 714, 95 S. Ct. 1215, 43 L. Ed. 2d 570. In *Hass* the Court reversed the judgment of the Supreme Court of Oregon, holding that the Oregon Supreme Court was in error when it ruled that a police officer's rebuttal testimony concerning prior inconsistent statements of the accused which would not have been admissible in the state's case in chief was, therefore, also inadmissible in rebuttal, on Fifth

and Fourteenth Amendment grounds. The Court did not prescribe what was necessary to prove that the trustworthiness of such evidence satisfies legal standards, but did state that "There is no evidence or suggestion that [the] statements were involuntary or coerced." 43 L. Ed. 2d, at 578.

Since *Harris*, three decisions of this court have considered the question of what is required by way of proof of voluntariness-trustworthiness before evidence inadmissible in the State's case in chief can be later admitted for impeachment purposes, and at least one federal court of appeals and appellate courts of three other states have considered that question. In *LaFrance v. Bohlinger*, 499 F. 2d 29 (1974), the United States Court of Appeals for the First Circuit held that before admitting for the purpose of impeachment of a government witness a statement in which the witness admitted having stolen a car together with the defendant, the trial court should have held an evidentiary hearing on the issue of whether the statement was coerced, and if it had so found, should have excluded the statement. In *Arizona v. Johnson*, 505 P. 2d 241 (1973), the Supreme Court of Arizona held admissible rebuttal testimony by a police officer, which testimony would not have been admissible in the prosecution's case in chief. The court noted with obvious approval that before that testimony had been admitted, there had been a voluntariness hearing in chambers and an appropriate finding by the trial court that the statement was voluntarily made by the defendant. Similarly, in *People v. Nudd*, 524 P. 2d 844, 847, the Supreme Court of California held that "the determination of voluntariness is still necessary under *Harris* when the statement is offered for impeachment".

A similar conclusion was reached by the Supreme Court of Delaware in *Hill v. Delaware*, 316 A. 2d 557 (1974). In that case the court held that the defendants had been denied their constitutional rights when certain out of court statements were allowed for impeachment purposes, without a finding by the court that the statements were made voluntarily. The court, noting that the defendants had

been advised of their *Miranda* rights, said, at 560, "[i]n this situation the test to be applied in determining whether use of the statement is proper is not whether the terms of *Miranda* have been met but, rather, whether the statement is otherwise 'trustworthy.' *Harris v. New York*, 401 U. S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1." The court went on to say that "[a]ccordingly we remand with instructions to make a determination of trustworthiness, which includes voluntariness of defendants statements."

We first took note of the controversy arising as an aftermath of *Harris* in *Layman v. State*, 14 Md. App. 215, 286 A. 2d 559 (1972) and in *Cooper v. State*, 14 Md. App. 106, 286 A. 2d 579 (1972). In *Layman*, decided January 31, 1972, the defendant had elected not to testify in his own defense, because of indications from the trial judge that he would permit the State to use for impeachment purposes statements of the defendant that would not have been admissible in the State's case in chief because they were defective under *Miranda*. We held that since the defendant had not testified and the State, therefore, did not attempt to offer his inconsistent extra-judicial statements for impeachment purposes, there was no record upon which we could consider the question of whether the trial judge had ruled properly on the matter.

In *Cooper*, decided January 24, 1972, we were presented with a claim by the appellant that the court permitted the State to impeach him by prior inconsistent statements absent an affirmative showing that the procedural safeguards of *Miranda* were met, as prescribed by our holding in *Franklin v. State, supra*. In our review of that claim, however, we found that as the State pursued the matter, it never reached the point of impeachment by a prior inconsistent statement, and we said that we would "leave to another time ... the many questions *Harris* poses for determination when they are properly before us.[4]" 14 Md. App. 116. In note 4, listing the unresolved questions posed by *Harris*, we asked the question: "Must there be a preliminary determination by the court that the trustworthiness of the statement satisfies legal standards? ... Hopefully, when

these and other questions raised by *Harris* are squarely before us the Supreme Court will have furnished some guidance."

That hope proved to be forlorn, for on February 10, 1972 we were "squarely" presented with the issue in *Sabatini v. State*, 14 Md. App. 431, 287 A. 2d 511 (1972). Although our decision in *Sabatini* did not answer all of the questions raised by *Harris*, we at least dealt with the question to an extent that appears to resolve the issue as it is presented to us in the case now at hand.

In *Sabatini*, the State called a police officer as a rebuttal witness to impeach the defendant's testimony by proof of prior inconsistent statements. Defense counsel objected, claiming that *Harris* required that a prior inconsistent statement of a defendant be proved to be voluntary before it could be used to impeach the defendant. Defense counsel asked for a hearing, out of the presence of the jury, on the voluntariness of the statement, but the court declined to hold such a hearing, overruled the objection, and permitted the officer to testify. In affirming Sabatini's conviction, we categorically rejected as no longer applicable because of *Harris* our prior holding in *Franklin v. State, supra.* Relying on *Barnhart v. State*, 5 Md. App. 222, 246 A. 2d 280 (1968), wherein we observed that even though it was prudent to hear evidence on the preliminary question of voluntariness out of the presence of the jury it was not reversible error not to do so when the confession was properly admitted, we found that the refusal of the trial judge to hold a hearing on the issue of voluntariness before the impeachment evidence was admitted did not constitute reversible error.[1] We reached this result in *Sabatini* from our own review of the record, which revealed that the trial court had, *after* the statement was admitted, heard evidence going to the point,

---

1. Although we hold in this case, as in *Sabatini*, that a preliminary voluntariness determination is not *necessary* before admitting prior inconsistent statements of the accused into evidence for impeachment purposes, if the entire record shows that those statements were voluntarily made, we believe it the far better practice for the trial judge to conduct an evidentiary hearing *before* admitting the disputed evidence. Such a hearing could quickly and concisely dispose of the question and obviate any necessity for a later exhaustive examination of the entire record.

and we found from that record that the disputed statements "were voluntarily made, assistance of counsel being effectively waived and the evidence being sufficient to show that Sabatini was not coerced, threatened, or unconstitutionally induced by hope held out or promise made." *Sabatini v. State, supra,* at 451.

Because Sabatini dealt with the precise point that is now before us, we must assume that it is controlling, and that its holding is our post-*Harris* rule on the use for impeachment purposes of prior inconsistent statements, testimony as to which would not have been admissible in the case in chief because of failure to comply with *Miranda.*

It being conceded by both parties that no preliminary or separate determination of voluntariness was made by the trial judge in the present case, it is now incumbent upon us, as in *Sabatini,* to make an independent constitutional appraisal of the record to ascertain whether there was any evidence on the point sufficient to establish that the rebuttal evidence did satisfy legal standards. *Davis v. North Carolina,* 384 U. S. 737, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966); *Jenkins v. State,* 25 Md. App. 551, 334 A. 2d 549 (1975); *Kelly v. State,* 14 Md. App. 287, 286 A. 2d 806 (1972); *Walker v. State,* 12 Md. App. 684, 280 A. 2d 260 (1971); *Herbert v. State,* 10 Md. App. 279, 269 A. 2d 430 (1970).

Such an examination is hardly an exhaustive task in this case. The testimony of Mr. Christian, the first of the State's two witnesses, indicates that he was not present at the hospital at the time the conversation between Detective Grimes and the Appellant ensued. Mr. Christian's testimony about the hospital is simply to the effect that he went there, saw the Appellant in a hospital gown, and advised the detective that he was his assailant. When he saw the Appellant, he was in the "vicinity with the detectives" and no one else was nearby.

Detective Grimes' testimony about the circumstances surrounding his conversation with the Appellant is scarcely more illuminating. In his direct testimony he said that he observed the defendant sitting in the emergency room being

treated for a gun shot wound of the left shoulder. The defendant was dressed in hospital clothes, with his own clothes in a pile next to him. After viewing the defendant and looking at his clothes, "I interviewed the defendant at that time. Not as a defendant. I asked him what — how he got shot." On cross-examination, he stated that when Mr. Christian identified the defendant in the hospital, police officers, nurses and doctors were present. When he was called as a rebuttal witness, Detective Grimes' testimony was restricted to his conversation with the defendant and he did not attempt to shed any light on the circumstances surrounding the conversation.[2]

The Appellant, in his own testimony, said nothing that amplifies the record on the circumstances under which he had his conversation with Detective Grimes. In fact, he stated that he told the officer, while in the hospital, the same version of the evidence that he gave in his direct testimony at trial — that he had been shot by a taxicab driver. The Appellant testified further, both on direct examination and on cross-examination, that on the evening in question he was "slightly intoxicated", "kind of sick" and was taking phenobarbital and dilantin for an epileptic condition. The record is clear that he was suffering from a gun shot wound, from which "blood was coming out", and he also testified that he was "scared and panic[ed]." On cross-examination, he categorically denied having told the detective that he had been involved in a fight at Park Circle and Park Heights Avenue and had been shot as a result thereof.

2. Franklin's objections to testimony on his "silence" concern the response of Det. Grimes when he was asked, when called as a rebuttal witness, how Appellant had explained the fact that the clothing he claimed to have been wearing when shot contained no bullet holes. To that question, Grimes responded: "He didn't [explain it]." This testimony, Appellant urges, is inadmissible under *United States v. Hales*, 422 U.S. 171, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975) and *Sutton v. State*, 25 Md. App. 309, 334 A. 2d 126 (1975). We are not persuaded that this testimony does, in fact, concern the Appellant's "silence". It is, in our view, equally susceptible to the interpretation that the Appellant attempted to explain the absence of bullet holes in his clothing, but was unable to cogently do so. This is one more example of the inadequacy of the record in this case. The State points out, correctly, that Franklin made no objection to the question about the absence of bullet holes, and so that matter is not properly before us. Md. Rule 522 d 2. *Sutton v. State, supra,* at 316.

There is simply not enough in this record to enable us to reach a conclusion as to whether the statements made by Appellant were voluntary and free of coercion or other unconstitutional inducement. The record is vague as to where in the hospital he was questioned, as to who was present during the questioning, and how long that questioning continued. We are not told exactly when he was arrested, nor where — although we are told that he was not under arrest at the time he was being questioned. The Appellant's testimony that he was frightened, intoxicated, under the influence of narcotics, and bleeding on the night of the crime raised questions as to whether his words were voluntarily uttered at a time when he knew and understood what he was saying — questions all the more acute because of his denial that he told Detective Grimes a version of the events inconsistent with that which he gave at trial, and this record supplies no answers to those questions. *Cummings v. State,* 27 Md. App. 361, 341 A. 2d 294 (1975); *Dempsey v. State,* 24 Md. App. 8,330 A. 2d 204 (1974); *Mundell v. State,* 244 Md. 91, 223 A. 2d 184 (1966); *Bryant v. State,* 229 Md. 531, 185 A. 2d 190 (1962).

As we read *Sabatini,* we are required to reverse in this case, because here, as in *Sabatini,* there was no preliminary evidentiary hearing, and because here, unlike *Sabatini,* we cannot find from our own appraisal of the record any evidence which could have persuaded the trial judge of the voluntary nature of those statements.[3]

It can hardly be argued that the error in this case is harmless error, for the defect in this record goes to the very substance of the question before the trial court: the credibility of the Appellant. Prior to Detective Grimes' rebuttal testimony, the trial judge had heard two directly conflicting versions of what happened on the night of

**3.** It is immaterial, in our view, that the prior inconsistent statements sought to be excluded in *Sabatini* were inculpatory, while those in the case at hand are exculpatory. For purposes of admissibility it is clear that "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution." *Miranda v. Arizona,* 384 U. S. 436, 477; *Law v. State,* 21 Md. App. 13, 33, 318 A. 2d 859 (1974) Note 5.

December 19, 1974: the cab driver's testimony that the Appellant not only attempted to rob him, but actually fired shots at him, and the Appellant's testimony that the cab driver had assaulted him when he was unable to pay his fare. We do not mean to suggest that the question of credibility was in equal balance between the witnesses, because of the corroborative testimony of Detective Grimes that the taxicab had bullet holes in the windshield and elsewhere; but certainly a decision as to the credibility of the witnesses was essential to a verdict in this case. The rebuttal testimony of Detective Grimes, if believed by the trial judge, was devastating to the Appellant's credibility, not only because it consisted of a totally different version of the events from that recited by the Appellant at trial, but also because that version was given by the Appellant within hours after the event, and to a police officer to whom Appellant could have made complaint about the cab driver if the cab driver was, in fact, the actual assailant.

We find, therefore, that the failure of the trial judge to hold an evidentiary hearing on the voluntariness or trustworthiness of the Appellant's extrajudicial statements to the officer, and the absence of any other evidence in the record showing those statements to have been freely and voluntarily given, without coercion, threats or inducements, amounts to serious error, for which this case must be remanded for retrial.

We will not, in this case, attempt to spell out in detail precisely what is required of the trial court when the State seeks, over defendant's objection, to impeach his testimony by proof of prior inconsistent statements. *Sabatini*, as noted, holds that under these circumstances it is not required that a preliminary voluntariness determination be made, and so it follows that not all of the strictures attendant to the introduction of a confession as part of the State's case in chief are applicable. See *Mulligan v. State*, 18 Md. App. 588, 597, 308 A. 2d 418 (1973), where Judge Gilbert discusses the standard of proof required at a suppression hearing under *Jackson v. Denno*, 378 U. S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *Barnhart v. State, supra; Smith v. State*, 189 Md.

596, 56 A. 2d 818 (1948).[4] *Sabatini*, however, is bottomed on the finding of this court, from the record, that the statements of the appellant there in question "were voluntarily made ... the evidence being sufficient to show that Sabatini was not coerced, threatened or unconstitutionally induced by hope held out or promise made," and we are persuaded that these are the factors which must appear in order to meet the requirement of *Harris* that "the trustworthiness of the evidence satisfies legal standards."

In *Sutton v. State,* 25 Md. App. 309, 334 A. 2d 126 (1975), we found that the trial court had misinterpreted *Harris v. New York, supra,* by permitting the State to impeach the appellant by rebuttal testimony that he had remained silent when asked certain questions by police officers, and we reversed the conviction. As we have noted hereinbefore, *Sutton* is not applicable to the case at hand, as it turned solely on the constitutional right to remain silent, and Franklin's contention that *his* constitutional right to remain silent was infringed is not properly before us, as he failed to object to testimony in that regard when it was offered.

In *Sutton,* however, Judge Gilbert quoted, with obvious approval, from the dissent of Judge Levin in *People v. McColor,* 36 Mich. App. 455, 194 N. W.2d 99 (1971). We believe that a portion of that quotation bears repetition here:

"*Harris* concerns the *Miranda* warnings. The rights with which we are concerned existed before *Miranda.* The difficulties experienced in the enforcement of the *Miranda* requirements should

4. See also *Kidd v. State,* 33 Md. App. 445, 366 A. 2d 761 filed November 3, 1976 in which Judge Moylan eloquently and exhaustively reiterates the principle that nothing in *Harris* obviates the State's burden of proving that the statement of a defendant complies with traditional voluntariness standards, whether· the statement is offered in the State's case on the merits, or, as in this case, for a more limited purpose. In *Kidd,* as in *Sabatini,* the defendant had elected trial by jury, but the rules incident to the applicable standards for admitting statements of the defendant are the same, whether the trial is by jury, or by the court alone. *Ralph v. State,* 226 Md. 480, 174 A. 2d 163 (1961); *Barnhart v. State,* 5 Md. App. 222, 246 A. 2d 280 (1968). See also *State v. Hutchinson,* 260 Md. 227, 271 A. 2d 641 (1970).

not be seized upon to erode rights existent before *Miranda*." 25 Md. App. 319

That simple statement, in our view, clearly enunciates a principle that is not only applicable to the case at hand, but to all *Harris* cases.

> *Judgment reversed: case remanded for new trial.*
> *Costs to be paid by Mayor & City Council of Baltimore.*