## STATE OF MARYLAND *v.* STEPHEN FRANKLIN

[No. 155, September Term, 1976.]

*Decided July 18, 1977.*

---

52

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Robert B. Levin,* with whom were *Frank, Bernstein, Conaway & Goldman* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Stephen Franklin was shot on the evening of 19 December 1974. The aftermath was a charge against him of attempting to rob Jarrett D. Christian, a taxicab driver, with a dangerous and deadly weapon, a trial in the Criminal Court of Baltimore at which he was convicted by the court of the offense, and a sentence of twenty years. On direct appeal the Court of Special Appeals reversed the judgment and remanded the case for a new trial. *Franklin v. State,* 33 Md. App. 690, 366 A. 2d 111 (1976). On certiorari we shall reverse the judgment of the Court of Special Appeals, thereby leaving the judgment of the trial court standing.

I

The State presented evidence in its case in chief through the testimony of Christian and John Grimes, a detective in the Baltimore City Police Department who investigated the incident. Franklin was the only witness for the defense. Up to a crucial point, the testimony of Christian and the testimony of Franklin did not conflict. Christian said he picked up Franklin [1] and two girls about 9:30 p.m. at the corner of Pennsylvania Avenue and Laurens Street in Baltimore City. Franklin verified this. He explained that he was on Pennsylvania Avenue and was ready to go home because he felt "kind of sick." He was "slightly intoxicated, just a little bit" but "knew what [he] was doing." He had "been on medication," phenobarbital and dilantin, under a

---

[1]. Christian made a positive extrajudicial identification of Franklin as the man he picked up. At trial he said Franklin looked like the man. The identification of Franklin as the man involved in the incident was never an issue.

doctor's prescription, "ever since 1958 . . . for a [s]hot in the head." Two girls asked where he was going, and when he told them to Pimlico (he lived on Queensberry Avenue), they asked if he wanted to ride with them in a cab. He told them he had only "a dollar and something" and they offered to "take [him] up." They hailed Christian's cab. Both Christian and Franklin said the girls left the cab at Ashburton Street and North Avenue. Franklin observed that they left "giggling," leaving him "stuck" with the fare. According to Christian and Franklin, Franklin directed Christian to an address on Spaulding Avenue near Park Heights Avenue. Franklin said a friend lived there. Christian waited in the cab while Franklin went to the house and knocked on the door. There was no answer to his knock. He returned to the cab.[2]

At this point the testimony of Christian and Franklin diverged. Christian's version was that he was making an entry in his log when Franklin approached him on the driver's side with his hands in his pockets and said: "You know what this is. Give it up." Christian took off in the cab, hitting a pole while trying "to make it through [an] alley." He heard shots fired, saw his windshield was hit, grabbed a gun he kept in the cab, jumped out and started firing. He fired five shots at Franklin but did not know whether he hit him. Bullets fired at the cab struck the windshield, a door and the rear of the vehicle.

According to Franklin, when he returned to the cab Christian "had a pistol at my face. . . . Right there I panicked because I was shot twice. This is the third time . . . . I ran down the alley. About a second later I heard five shots. I was hit with one of them. I scared. I stopped at Garrison. He came through with the cab, and then he stopped." Calling Franklin an obscene name, Christian ordered him to come out from behind the bushes. "So I came

2. In Franklin's version, there was a stop on the way to Spaulding Avenue, at "Willie Richardson's" to see if he could find someone "to get some money to pay the rest of the fare," but there "wasn't nobody in there." Christian said that when Franklin received no answer to his knock at the house on Spaulding Avenue, he went to the house next door and knocked on the door. It was when no one answered there that Franklin returned to the cab.

out." Franklin told Christian: "I got one dollar, something. I live right around the corner . . . . You go around the corner, you get the rest of your money." Christian replied: "No, just throw the dollar across the hood." Franklin flatly denied that he attempted to rob Christian. Franklin went home, changed shirts and put on a leather jacket. His sister took him to the hospital.

Christian reported the incident to the police. Grimes received a report over his car radio about 10:30 p.m., went to the scene and talked to Christian. About an hour later he went to Sinai Hospital in response to a call that a man was being treated for a gunshot wound. Franklin was in the emergency room dressed in hospital garb. He had a bullet wound in his left shoulder. His clothes, a three-quarter length brown jacket and a shirt, were nearby. There were no bullet holes in this clothing. Grimes notified Christian through "Communications" to come to the hospital. Grimes and Christian each testified to the effect that Christian arrived at the hospital about twenty minutes later, saw Franklin in the emergency room, and, unsolicited, made a positive identification of him as the man who attempted to rob him. Franklin testified that when Christian came in the officer asked: "Is that the one?" Christian said, "Yeah," and ran right back out. Grimes went to Franklin's home and was given Franklin's jacket and sweater by Franklin's sister. Each garment had a hole in the left shoulder. There were blood stains around the hole in the sweater.

During direct examination Grimes said he "interviewed" Franklin in the hospital when he saw that there was no bullet hole in either Franklin's jacket or shirt. He asked Franklin how he got shot. Defense counsel objected to the prosecutor's inquiry: "And what did he say?" The objection was on the specific ground that "there has been no testimony that the Defendant was advised of his rights before interrogation." After a very brief discussion the prosecutor withdrew the question "to avoid the problem."

Franklin referred to the "interview" by the officer in his direct examination. He said that after the cab driver came in and identified him, "[t]he officer right there he questioned

me where my pistol was at, but I don't own a gun." On cross-examination Franklin was asked: "[W]hen the officers came to see you at the hospital, ·what did you tell them happened?" The transcript reads:

A: I told them I got shot.

Q: And, how did you get shot?

A: Cab driver shot me.

Q: Didn't you tell them you had gotten in an argument down at Park Circle and Park Heights, and as a result of that, you had been shot?

A: I don't know nobody there.

Q: So what exactly do you recall telling the officer?

A: That I got shot by a cab driver.

Q: And did you give a reason why you were shot?

A: I told them everything like I am telling you all.

Q: Which is — repeat again what you told the officer, please.

A: Right.

Q: Repeat it.

A: I told them I got shot by a cab driver. You want me to repeat my statement as far as getting out of the cab and running stuff?

Q: It's your testimony then that you did not tell the officers that you were involved in a fight, someone shot you as a result of a fight?

A: Yes, sir.

The State called Grimes in rebuttal. The prosecutor inquired about Grimes's "interview" with Franklin at the hospital. Grimes said: "I asked him how he got shot." Defense counsel objected. The court overruled the objection, stating: "I'll let it in for impeachment purposes only at this time." The transcript reads:

THE WITNESS: He stated that he was in a fight at Park Circle with another subject and he got shot in the back. That is when I questioned him about

the clothes. He stated he came right from Park Circle to the hospital. That's why I questioned him about the hole, why there was no bullet holes in his clothes.

* * *

Q: Did he at any time tell you he was shot by a cab driver.

A: No.

## II

The issue for decision is the propriety of the admission of Franklin's extrajudicial statement for the purpose of impeaching his credibility.

*Miranda v. State of Arizona,* 384 U. S. 436, 86 S. Ct. 1602 (1966), barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It established prophylactic safeguards to assure that such evidence be excluded. *Harris v. New York,* 401 U. S. 222, 224, 91 S. Ct. 643 (1971), and *Oregon v. Hass,* 420 U. S. 714, 722, 95 S. Ct. 1215 (1975), declared that "[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." *Harris* and *Hass* held that the credibility of a defendant in a criminal cause was appropriately impeached by use of his extrajudicial conflicting statements, even though the *Miranda* warnings were defective, or, if properly given, were not effectively waived. *Harris,* 401 U. S. at 226; *Hass,* 420 U. S. at 723-724. In neither case was claim made that the statements were coerced or involuntary. *Harris,* 401 U. S. at 224; *Hass,* 420 U. S. at 722. In both cases, the statements partially contradicted the defendant's direct testimony at trial. *Harris,* 401 U. S. at 223; *Hass,* 420 U. S. at 721.

We had occasion to construe the *Harris-Hass* limitation of *Miranda* in *State v. Kidd,* 281 Md. 32, 375 A. 2d 1105 (1977). Our decision that the trial judge there erred in

admitting the impeaching statement entailed the determination that a statement may be received in evidence at the criminal trial of the declarer for the purpose of impeaching his credibility, not generally, but specifically with regard to a contradiction, reasonably inferred, between issues initiated by him on direct examination and the impeaching statement, provided the trustworthiness of the evidence satisfies legal standards. This is so even though the statement was obtained during a custodial interrogation without the warnings required by *Miranda* being given, or defectively given, or, if properly given, not effectively waived.[3]

For the purpose of decision here we make two assumptions consistent with Franklin's initial objection to the admission of his statements. First, we assume that Franklin's extrajudicial statement[4] was obtained during a custodial interrogation[5] within the contemplation of *Miranda. But see Oregon v. Mathiason,* 429 U. S. 492, 97 S. Ct. 711 (1977); *Beckwith v. United States,* 425 U. S. 341, 96 S. Ct. 1612 (1976); *Cummings v. State,* 27 Md. App. 361, 341 A. 2d 294 (1975); *Tillery v. State,* 3 Md. App. 142, 238 A. 2d 125 (1968). Second, we assume that there was no compliance with the *Miranda* dictates. With these assumptions, we apply to the case before us the *Harris-Hass* limitation of *Miranda* with respect to the impeachment exception. Franklin's extrajudicial statements were offered and

---

**3.** We were not persuaded to expand the *Harris-Hass* impeachment exception beyond its dictates as we perceived them in the light of the facts and circumstances of those cases. For a vigorous criticism of the majority opinion in Harris v. New York, 401 U. S. 222, 91 S. Ct. 643 (1971) see the dissenting opinion of Mr. Justice Douglas from a denial of certiorari in Riddell v. Rhay, 404 U. S. 974, 92 S. Ct. 336 (1974).

**4.** Franklin's version of his statement may be deemed an "admission" as tending to establish the ultimate fact of guilt in that it positively identified Franklin as the passenger in Christian's taxicab. *See* Stewart v. State, 232 Md. 318, 323, 193 A. 2d 40 (1963). Therefore, it was not purely exculpatory. The police version of his statement was exculpatory in that it explained his wound in terms which tended to absolve him from the attempted robbery.

**5.** Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. State of Arizona, 384 U. S. 436, 444, 86 S. Ct. 1602 (1966).

received for the purpose of impeaching his credibility specifically. There was a direct contradiction as to the circumstances of the shooting between his testimony at the trial and the impeaching statements. The issue was initiated by Franklin during his direct examination when he gave his version of those circumstances. The first two factors for the impeachment exception to the shield provided by *Miranda* were clearly satisfied. There remains the provision that no be admissible the trustworthiness of the statement must satisfy legal standards. In this respect we are unable to distinguish the case *sub judice* from *Harris* and *Hass*. In both *Harris* and *Hass* the challenged statements were admitted, and, therefore, must have satisfied legal standards as to trustworthiness. The only indication in *Harris* that the statements satisfied the proviso was the declaration: "Petitioner makes no claim that the statements made to the police were coerced or involuntary." *Harris*, 401 U. S. at 224. The only indication in *Hass* that the statements satisfied the proviso was the assertion: "There is no evidence or suggestion that Hass' statements . . . were involuntary or coerced," *Hass*, 420 U. S. at 722, and the observation: "He properly sensed, to be sure, that he was in 'trouble'; but the pressure on him was no greater than that on any person in like custody or under inquiry by any investigating officer." *Id*. at 722-723.

Like *Harris*, Franklin made no claim that the statements he made to Grimes were coerced or involuntary. Like *Hass*, there is no evidence or suggestion that his statements were involuntary or coerced. He may have sensed, as did Hass, that he was in "trouble," but as in *Hass*, the pressure on him was no greater than that on any other person under inquiry by any investigating officer. On direct examination Franklin volunteered that a police officer questioned him at the hospital. On cross-examination, this was pursued by the prosecutor asking Franklin what he told the officers when they saw him at the hospital. Without any objection whatsoever, Franklin recounted what he had told the officer, iterated the statements he had made and reiterated them.

He denied the suggestion that he had said other than what he claimed he said. Far from indicating in any manner that he spoke involuntarily to the police or that his statements were the product of any physical or psychological coercion, it was clear that he desired that what he alleged he told the police be before the court. He insisted that what he told the police was exactly what he had testified to on direct examination, namely that the cab driver had shot him under circumstances that refuted the charge of attempted robbery. It is obvious that what challenge he made went, not to voluntariness in the giving of the statements, but to the police officer's version of their content. The conflict between what he claimed he said and what the police claimed he said did not render the statements inadmissible; that conflict was to be resolved by the trier of fact. Under such circumstances, there can be no doubt that the statements were "trustworthy" within the apparent contemplation of *Harris* and *Hass.*

It follows that Franklin's statements fully met the test for the impeachment exception announced in *Harris* and *Hass.* As in those cases, the impeaching material here would provide valuable aid to the trier of fact in assessing the defendant's credibility; again the benefits of this process should not be lost; and again, making the deterrent-effect assumption, there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief. If all this sufficed for the result in *Harris* and *Hass,* it supports and demands a like result in Franklin's case. "Here, too, the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Hass,* 420 U. S. at 722. The effect of inadmissibility in the *Harris* case, in the *Hass* case and in this case is the same: "inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth." *Id.* at 723. Having voluntarily taken the stand, Franklin was under

an obligation to speak truthfully and accurately, and the prosecution here, as in *Harris* and *Hass*, did no more than utilize the traditional truth-testing devices of the adversary process. *Harris*, 401 U. S. at 225.

The Court of Special Appeals reversed the judgment of the trial court on a finding "[t]hat the failure of the trial judge to hold an evidentiary hearing on the voluntariness or trustworthiness of [Franklin's] extrajudicial statements to the officer, and the absence of any other evidence in the record showing those statements to have been freely and voluntarily given, without coercion, threats or inducements, amounts to serious error, for which this case must be remanded for retrial." *Kidd v. State, supra,* 33 Md. App. at 705. We do not agree. As we have found, no issue of voluntariness or trustworthiness of Franklin's extrajudicial statements was ever presented so as to compel an evidentiary hearing. *See* Maryland Rules 522 and 725 f. *Wainwright v. Sykes,* 433 U. S. 72, 86-87, 97 S. Ct. 2497, 45 U.S.L.W. 4807, 4811 (1977); *Jackson v. Denno,* 378 U. S. 368, 380, 84 S. Ct. 1774 (1964); *Tucker v. State,* 237 Md. 422, 425, 206 A. 2d 691 (1965); *Gaudio and Bucci v. State,* 1 Md. App. 455, 463, 230 A. 2d 700 (1967). State procedural requirements governing assertions and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected. *Mapp v. Ohio,* 367 U. S. 643, 658, n. 9, 81 S. Ct. 1684 (1961); *Porter v. State,* 230 Md. 535, 536-537, 187 A. 2d 870 (1963). Furthermore, as we have indicated, the record plainly reflected that the statements were freely and voluntarily given. *See Sabatini v. State,* 14 Md. App. 431, 451, 287 A. 2d 511, *cert. denied,* 265 Md. 742 (1972).

"We are, after all, always engaged in a search for truth in a criminal case so long as the search is surrounded with the safeguards provided by our Constitution." *Hass,* 420 U. S. at 722. There was no violation of those safeguards in the circumstances here. We hold that the trial judge did not err in admitting Franklin's extrajudicial statements into

evidence. We reverse the judgment of the Court of Special Appeals.[6]

> *Judgment of the Court of Special Appeals reversed; case remanded to the Court of Special Appeals for passage of an order affirming the judgment of the Criminal Court of Baltimore; costs to be paid by appellee.*

---

**6.** No question is presented as to the laying of the foundation for the impeaching statements. In any event, it is clear that the foundation for their introduction was properly laid. *See* State v. Kidd, 281 Md. 32, 46, n. 8, 375 A. 2d 1105 (1977).